Re: *James Matthew Morris v. Taylor Communications Secure & Customer Solutions,
Inc., Venture Solutions, Inc. and Taylor Corporation*

Exhibit to Defendant's Notice of Removal

# Exhibit A

27302/1/9562841v1

# COMMONWEALTH OF VIRGINIA





Proper attire required in Court Rooms
NO shorts
NO halters/tank tops
NO flip-flop shoes
NO t-shirts
NO hats
NO food, drinks or gum
NO cell phones in Courthouse

## ROANOKE CITY CIRCUIT COURT
Civil Division
315 CHURCH AVENUE, SW
ROANOKE VA 24016
(540) 853-6702

**Proof of Service**

Virginia:

In the ROANOKE CITY CIRCUIT COURT

Case number: 770CL20001963-00
Service number: 001
Service filed: September 01, 2020

Served by: SPECIAL PROCESS SERVER
Judge:

Style of case: JAMES MATTHEW MORRIS  vs TAYLOR COMMUNICATIONS SECURE &

Service on: TAYLOR COMMUNICATIONS SECURE &       Attorney: BRITTANY M HADDOX
CUSTOMER SOLUTIONS, INC.                540-283-0802
TOMMIE BRADDOCK, PRESIDENT
1725 ROE CREST DRIVE
NORTH MANKATO MN 56003

Instructions: SEE THE ATTACHED COMPLAINT

Returns shall be made hereon, showing service of Summons issued Wednesday, September 02, 2020 with a copy of the Complaint filed Tuesday, September 01, 2020 attached.

Hearing date   :

Service issued: Wednesday, September 02, 2020

For Sheriff Use Only

# COMMONWEALTH OF VIRGINIA



Proper attire required in Court Rooms
NO shorts
NO halters/tank tops
NO flip-flop shoes
NO t-shirts
NO hats
NO food, drinks or gum
NO cell phones in Courthouse

### ROANOKE CITY CIRCUIT COURT
Civil Division
315 CHURCH AVENUE, SW
ROANOKE VA 24016
(540) 853-6702

Summons

To: TAYLOR COMMUNICATIONS SECURE &
CUSTOMER SOLUTIONS, INC.
TOMMIE BRADDOCK, PRESIDENT
1725 ROE CREST DRIVE
NORTH MANKATO MN 56003

Case No. 770CL20001963-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Wednesday, September 02, 2020

Clerk of Court: BRENDA S. HAMILTON

by _____
(CLERK/DEPUTY CLERK)

Instructions:      SEE THE ATTACHED COMPLAINT

Hearing Official:

Attorney's name:      BRITTANY M HADDOX
540-283-0802

# COMMONWEALTH OF VIRGINIA



Proper attire required in Court Rooms
NO shorts
NO halters/tank tops
NO flip-flop shoes
NO t-shirts
NO hats
NO food, drinks or gum
NO cell phones in Courthouse

## ROANOKE CITY CIRCUIT COURT
Civil Division
315 CHURCH AVENUE, SW
ROANOKE VA 24016
(540) 853-6702

Proof of Service

Virginia:
In the ROANOKE CITY CIRCUIT COURT

Case number: 770CL20001963-00
Service number: 002
Service filed: September 01, 2020

Served by: SPECIAL PROCESS SERVER
Style of case: JAMES MATTHEW MORRIS vs TAYLOR COMMUNICATIONS SECURE &
Service on: VENTURE SOLUTIONS, INC.
TOMMIE BRADDOCK, PRESIDENT
& CEO
1725 ROE CREST DRIVE
NORTH MANKATO MN 56003

Judge:

Attorney: BRITTANY M HADDOX
540-283-0802

Instructions: SEE THE ATTACHED COMPLAINT

Returns shall be made hereon, showing service of Summons issued Wednesday, September 02, 2020 with a copy of the
Complaint filed Tuesday, September 01, 2020 attached.

Hearing date   :

Service issued: Wednesday, September 02, 2020

For Sheriff Use Only

# COMMONWEALTH OF VIRGINIA



Proper attire required in Court Rooms
NO shorts
NO halters/tank tops
NO flip-flop shoes
NO t-shirts
NO hats
NO food, drinks or gum
NO cell phones in Courthouse

## ROANOKE CITY CIRCUIT COURT
Civil Division
315 CHURCH AVENUE, SW
ROANOKE VA 24016
(540) 853-6702

Summons

To: VENTURE SOLUTIONS, INC.
TOMMIE BRADDOCK, PRESIDENT
& CEO
1725 ROE CREST DRIVE
NORTH MANKATO MN 56003

Case No. 770CL20001963-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Wednesday, September 02, 2020

Clerk of Court: BRENDA S. HAMILTON

by _____
(CLERK/DEPUTY CLERK)

Instructions:    SEE THE ATTACHED COMPLAINT

Hearing Official:

Attorney's name:    BRITTANY M HADDOX
540-283-0802

# COMMONWEALTH OF VIRGINIA



Proper attire required in Court Rooms
NO shorts
NO halters/tank tops
NO flip-flop shoes
NO t-shirts
NO hats
NO food, drinks or gum
NO cell phones in Courthouse

ROANOKE CITY CIRCUIT COURT
Civil Division
315 CHURCH AVENUE, SW
ROANOKE VA 24016
(540) 853-6702

Summons

To: VENTURE SOLUTIONS, INC.
TOMMIE BRADDOCK, PRESIDENT
& CEO
1725 ROE CREST DRIVE
NORTH MANKATO MN 56003

Case No. 770CL20001963-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Wednesday, September 02, 2020

Clerk of Court: BRENDA S. HAMILTON

by _____
(CLERK/DEPUTY CLERK)

Instructions:    SEE THE ATTACHED COMPLAINT

Hearing Official:

Attorney's name:    BRITTANY M HADDOX
540-283-0802

# COMMONWEALTH OF VIRGINIA



Proper attire required in Court Room
NO shorts
NO halters/tank tops
NO flip-flop shoes
NO t-shirts
NO hats
NO food, drinks or gum
NO cell phones in Courthouse

## ROANOKE CITY CIRCUIT COURT
Civil Division
315 CHURCH AVENUE, SW
ROANOKE VA 24016
(540) 853-6702

Summons

To: TAYLOR CORPORATION
GLEN A. TAYLOR, CEO
1725 ROE CREST DRIVE
NORTH MANKATO MN 56003

Case No. 770CL20001963-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Wednesday, September 02, 2020

Clerk of Court: BRENDA S. HAMILTON

by _____
(CLERK/DEPUTY CLERK)

Instructions:    SEE THE ATTACHED COMPLAINT

Hearing Official:

Attorney's name:    BRITTANY M HADDOX
540-283-0802

# COMMONWEALTH OF VIRGINIA



Proper attire required in Court Rooms
NO shorts
NO halters/tank tops
NO flip-flop shoes
NO t-shirts
NO hats
NO food, drinks or gum
NO cell phones in Courthouse

## ROANOKE CITY CIRCUIT COURT
Civil Division
315 CHURCH AVENUE, SW
ROANOKE VA 24016
(540) 853-6702

Summons

To: TAYLOR CORPORATION
GLEN A. TAYLOR, CEO
1725 ROE CREST DRIVE
NORTH MANKATO MN 56003

Case No. 770CL20001963-00

The party upon whom this summons and the attached complaint are served is hereby notified that unless within 21 days after such service, response is made by filing in the clerk's office of this court a pleading in writing, in proper legal form, the allegations and charges may be taken as admitted and the court may enter an order, judgment, or decree against such party either by default or after hearing evidence.

Appearance in person is not required by this summons.

Done in the name of the Commonwealth of Virginia on, Wednesday, September 02, 2020

Clerk of Court: BRENDA S. HAMILTON

by _____
(CLERK/DEPUTY CLERK)

Instructions:    SEE THE ATTACHED COMPLAINT

Hearing Official:

Attorney's name:    BRITTANY M HADDOX
540-283-0802

VIRGINIA:

IN THE
CIRCUIT COURT FOR THE CITY OF ROANOKE

JAMES MATTHEW MORRIS, )
)
    Plaintiff, )
)
v. )   Case No. CL20-1963
)
TAYLOR COMMUNICATIONS SECURE )
& CUSTOMER SOLUTIONS, INC., )
Serve:  **Tommie Braddock, President** )
       **1725 Roe Crest Drive** )
       **North Mankato, MN 56003** )
)
and )
)
VENTURE SOLUTIONS, INC., )
Serve:  **Tommie Braddock, President & CEO** )
       **1725 Roe Crest Drive** )
       **North Mankato, MN 56003** )
)
and )
)
TAYLOR CORPORATION, )
Serve:  **Glen A. Taylor, CEO** )
       **1725 Roe Crest Drive** )
       **North Mankato, MN 56003** )
)
    Defendants. )

## COMPLAINT

COMES NOW Plaintiff James Matthew Morris, by counsel, and moves for judgment against Defendants Taylor Communications Secure & Customer Solutions, Inc., Venture Solutions, Inc., and Taylor Corporation (hereinafter, collectively, "Defendants" or "Taylor Communications"), jointly and severally, and as grounds therefore states as follows:

(1)    At all times material hereto, Plaintiff James Matthew Morris is and was domiciled in the Commonwealth of Virginia.

1

Filed in the Clerk's Office this ___1___ day of _Sept_ 20 _20_

| | | | |
|---|---|---|---|
| Writ Tax | $ 25.00 | 206 Fee | $ 0 |
| Fee | 290.00 | 426 Fee | 5.00 |
| Ub Fee | 4.00 | Teste: | 2292.00 |
| 123 Fee | 9.00 | BRENDA S. HAMILTON, CLERK | |
| 106 Fee | 5.00 | | |
| 170 Fee | 10.00 | _Karen M Stapleton_ DC | |
| 147 Fee | 1.00 | | |
| Total Paid | $ 351.00 | | |

(2)    At all times material hereto, Defendant Taylor Communications Secure & Customer Solutions, Inc. is and was a corporation organized and existing under the laws of the State of Minnesota and doing business in the Commonwealth of Virginia and elsewhere.

(3)    At all times material hereto, Defendant Venture Solutions, Inc. is and was a corporation organized and existing under the laws of the State of Minnesota and doing business in the Commonwealth of Virginia and elsewhere.

(4)    On information and belief, Taylor Communications Secure & Customer Solutions, Inc. is an assumed name for Venture Solutions, Inc.

(5)    On information and belief, Taylor Corporation is a parent company for Taylor Communications Secure & Customer Solutions, Inc. and/or Venture Solutions, Inc.

(6)    At all times material hereto, Mr. Morris performed work on behalf of Taylor Communications in the Commonwealth of Virginia and elsewhere.

(7)    Taylor Communications has purposefully availed itself of the privilege of conducting activities in the Commonwealth of Virginia, thereby invoking the benefits and protections of state laws, and Plaintiff's claims arise out of those activities.

(8)    Mr. Morris is 61 years of age.

(9)    Taylor Communications works with businesses across the United States to help businesses with their communication needs, such as commercial printing, secure communications, labeling & packaging, promotional marketing, signs & graphics, corporate ID & branding, customer communications, technology

2

& mobile services, gift & loyalty cards, data solutions, warehousing & fulfillment, and business forms.

(10)    Mr. Morris began work for Taylor Communications in June of 2015 when Taylor Communications purchased the company that Mr. Morris was working for at the time.

(11)    At the times relevant hereto, Mr. Morris was a Technical Solutions Consultant for Taylor Communications.

(12)    As Technical Solutions Consultant, Mr. Morris was provided potential client leads by another department of Taylor Communications and/or Mr. Morris would generate his own potential client leads, and then, either way, pursuant to Mr. Morris' job description as directed by his manager orally and in writing during his tenure as a Technical Solution Consultant, it was Mr. Morris' responsibility to work with those potential clients to assess their needs, create solutions for the potential clients' needs, and then to obtain the clients' signatures on service agreements and statements of work setting forth the work that Taylor Communications agreed to perform and the funds the clients agreed to pay therefor.

(13)    Mr. Morris worked from home in the Commonwealth of Virginia in addition to traveling to various client locations across the United States for in-person presentations.

(14)    Mr. Morris' employment was terminated by Taylor Communications on or about April 6, 2020.

(15)    Taylor Communications falsely stated that Mr. Morris' employment was terminated due to financial hardships created by COVID-19.

3

(16)    Mr. Morris continued to bring in new work until the time he was terminated from Taylor Communications.

(17)    Mr. Morris' division met their goal numbers in the first quarter of 2020, the division brought in approximately 30% of Taylor Communications' total new revenue, and the division was considered essential during the COVID-19 pandemic.

(18)    Mr. Morris received a positive performance review just prior to being terminated from employment.

(19)    As explained further herein, Mr. Morris' employment was terminated to avoid paying commissions and/or because of his age.[1]

(20)    At the time of the termination of his employment, Mr. Morris was making a salary plus bonuses and commissions.

(21)    Mr. Morris was one of six Technical Solutions Consultants at Taylor Communications at the time his employment was terminated.

(22)    Among the Technical Solutions Consultants, Mr. Morris was the lead employee with respect to sales numbers.

(23)    None of the other Technical Solutions Consultants lost their employment when Mr. Morris lost his employment.

(24)    Taylor Communications has a Sales Compensation Plan that dictates the calculation for commissions and bonuses owed to consultants.

(25)    The Sales Compensation Plan for 2019 ("2019 Plan") is attached hereto as Exhibit 1.

---

[1] Mr. Morris has filed a Charge of Discrimination with the Equal Employment Opportunity Commission related to age discrimination.

(26)    Mr. Morris earned the $15,000 Revenue Retention Performance Target Bonus set forth in Exhibit A of Exhibit 1 for 2019.

(27)    With respect to the Revenue Retention Performance Target Bonus, Mr. Morris was informed on February 13, 2020:

**2019 Q4 Bonus Attainment and Q4 Gross Margin Attainment Payments:**
- Payouts are currently under review.
- Pursuant to the terms of the sales compensation plans, further payments are suspended pending the completion of an audit of the relevant calculations and source data.
- Following the results of this work, any decisions made will be communicated to you in a timely manner.

**Expected Timing:**
We expect to begin reviewing the detail of recommended 2019 disbursements by sales manager and sales employee in the next day or two and comparing it to the terms and conditions of the multiple plans and special programs that they are based upon. We will work quickly to conclude our review within the next two weeks. You can expect an update from us as soon as that review is complete, indicating what the path forward will be to resolve this matter.

(Exhibit 2).

(28)    To date, despite request, Mr. Morris has not been paid the $15,000 bonus he earned pursuant to the 2019 Plan.

(29)    Continuing, at the time that Mr. Morris' employment was terminated on or about April 6, 2020, he was waiting on the Sales Compensation Plan for 2020 to be published.

(30)    Mr. Morris was informed that when the 2020 Sales Compensation Plan was published, it will be effective back to January 1, 2020:

**2020 Sales Incentive Compensation Plan Details:**
- We are redesigning our sales compensation plans to regain sustainable profitability in our organization.
- Any plans that have been issued are withdrawn.
- We anticipate finalizing and issuing 2020 sales incentive plans as soon as reasonably possible.
- Plans will be retroactive to January 1, 2020 and paid out accordingly.

(Exhibit 2).

5

(31) Mr. Morris was informed by Angela Passanesi, Vice President of Sales, in mid-March 2020 that the 2020 Sales Compensation Plan was close to being finalized.

(32) Ms. Passanesi informed Mr. Morris that the 2020 Sales Compensation Plan that was being discussed would calculate commissions as follows for each service agreement that the employee secured with a client: 6% of revenue for first year of service agreement, 3% of revenue for year two of service agreement, and 1% of revenue for year three of service agreement.

(33) Mr. Morris was responsible for NelNet, Inc. signing a service agreement and statement of work ("NelNet, Inc. Service Agreement") with Taylor Communications on about February 10, 2020.

(34) Mr. Morris worked on the NelNet, Inc. Service Agreement for approximately one (1) year prior to the NelNet, Inc. Service Agreement being executed on or about February 10, 2020.

(35) The NelNet, Inc. Service Agreement was substantially larger, in terms of scope of work and compensation therefor, than the average deal that Taylor Communications typically was successful in arranging with clients.

(36) During the year that Mr. Morris worked on the NelNet, Inc. Service Agreement, Mr. Morris performed the work under the understanding, and based on representations by Taylor Communications, that Mr. Morris would be paid a significant commission for the NelNet, Inc. Service Agreement.

(37) Stating further, Mr. Morris was informed that he would be paid a commission once the master services agreement and statement of work were

executed, both of which were executed for the NelNet, Inc. Service Agreement on or about February 10, 2020.

(38) Had the terms of the 2019 Plan been in effect for 2020, Mr. Morris would have been owed approximately $180,000 for the NelNet, Inc. Service Agreement.

(39) If the Plan that Ms. Passanesi informed Mr. Morris about was in effect for 2020, Mr. Morris would have been owed approximately $600,000, over three years, for the NelNet, Inc. Service Agreement.

(40) Either way, Mr. Morris performed the work with the reasonable understanding that he was going to be paid a commission in excess of $150,000 for the work he performed.

(41) After Mr. Morris was terminated from employment, Taylor Communications published the Sales Compensation Plan for 2020 ("2020 Plan"), which is attached hereto as Exhibit 3.

(42) With respect to the Nelnet, Inc. Service Agreement, Mr. Morris materially contributed to the generation of the Commissionable Sale as defined by the 2020 Plan.

(43) The approximate commission owed to Mr. Morris for the NelNet, Inc. Service Agreement based on the 2020 Plan is $224,000.

(44) No commission for the NelNet, Inc. Service Agreement has been paid to Mr. Morris to date, despite repeated request.

(45) In addition, at the time Mr. Morris' employment was terminated, Mr. Morris was working on a services agreement with Bank of America valued at $5 million in revenue, also a larger than usual deal, which would have resulted in

7

a commission of approximately $150,000 to Mr. Morris, pursuant to the 2019 Plan. The commission would have been more under the 2020 Plan.

(46)   No commission for the Bank of America deal has been paid to Mr. Morris to date.

(47)   At the time Mr. Morris was notified that his employment was being terminated, his supervisor, Angela Passanesi, Vice President of Sales, notified Mr. Morris that she would help ensure that Mr. Morris was paid the commissions Mr. Morris was owed by Taylor Communications.

(48)   Mr. Morris' employment was terminated to avoid paying Mr. Morris the commission for the NelNet, Inc. Service Agreement, the 2019 Plan bonus, plus the commission he was in the process of earning for the Bank of America deal.

(49)   Upon the termination of his employment, Mr. Morris was provided a Settlement Agreement & General Release of all Claims that attempted to have Mr. Morris waive his right to be paid the commissions and bonuses he was owed for work performed for Taylor Communications.

(50)   Mr. Morris did not sign the unlawful agreement.

## COUNT I: WRONGFUL DISCHARGE: *BOWMAN* CLAIM

(51)   Plaintiff incorporates by reference herein the preceding paragraphs of this complaint.

(52)   Virginia Code § 40.1-29 provides that "[a]ll employers operating a business shall establish regular pay periods and rates of pay for employees except executive personnel. All such employers shall pay salaried employees at least once each month.... Upon termination of employment an employee shall be paid all wages or salaries due him for work performed prior thereto; such payment shall be

8

made on or before the date on which he would have been paid for such work had his employment not been terminated. ... No employer shall withhold any part of the wages or salaries of any employee except for payroll, wage or withholding taxes or in accordance with law, without the written and signed authorization of the employee. ... No employer shall require any employee, except executive personnel, to sign any contract or agreement which provides for the forfeiture of the employee's wages."

(53)   Plaintiff's employment was terminated to avoid paying Mr. Morris the commission for the NelNet, Inc. Service Agreement, the 2019 Plan bonus, plus the commission he was in the process of earning for the Bank of America deal.

(54)   Plaintiff was terminated from employment in violation of the public policy underlying Virginia Code § 40.1-29.

(55)   Plaintiff was, therefore, terminated in violation of *Bowman v. State Bank of Keysville*, 229 Va. 534 (1985).

(56)   Mr. Morris is entitled to recover unpaid wages, lost wages from the date of the loss of his employment through the date of trial, and to be reinstated to his former position at Taylor Communications, or in the alternative, to recover front wages due to the wrongful discharge.

## COUNT II: QUANTUM MERUIT

(57)   Plaintiff incorporates by reference herein the preceding paragraphs of this complaint.

(58)   Mr. Morris rendered valuable consideration to Taylor Communications, in the form of work performed to close the NelNet, Inc. Service Agreement deal, for which he has not been paid. The consideration has a

9

reasonable value of at least $150,000, although the exact amount is for the jury to determine.

(59)   At the time that Mr. Morris performed the work, he reasonably expected to be paid by Taylor Communications. Taylor Communications received and benefited from the work with knowledge or reason to know that Mr. Morris expected to be paid. Taylor Communications voluntarily accepted the benefit of the work and kept the benefits therefrom without waiving, refusing, or returning the benefit.

(60)   Mr. Morris is entitled under the doctrine of quantum meruit to recover damages from NelNet, Inc. Service Agreement in the amount of at least $150,000.

<strong><u>COUNT III: UNJUST ENRICHMENT</u></strong>

(61)   Plaintiff incorporates by reference herein the preceding paragraphs of this complaint.

(62)   At the specific request of Taylor Communications and for its use and benefit, Mr. Morris has performed work for Taylor Communications in the form of making sales of its products and services.

(63)   The value of the work performed for Taylor Communications by Mr. Morris for which Mr. Morris has not been paid is at least $150,000, although the exact amount is for the jury to determine.

(64)   During and since the performance of the work by Mr. Morris, Taylor Communications has failed to pay Mr. Morris, and there is due and owing to Mr. Morris from Taylor Communications a principal sum amount of at least $150,000.

10

(65)    Despite Mr. Morris being owed in excess of $150,000, Taylor Communications has failed and refused to pay the same or any part of it.

(66)    As a result of Taylor Communications' refusal to pay Mr. Morris the above-stated sum due and owing to Mr. Morris, Taylor Communications has become unjustly enriched in the amount of at least $150,000.

## COUNT IV: FRAUDULENT MISREPRESENTATION
### (Alternative Claim)

(67)    Taylor Communications, through its agents, represented to Mr. Morris that Mr. Morris would be paid commissions for service agreements that he successfully executed with potential clients.

(68)    Mr. Morris successfully executed a service agreement with NelNet., Inc.

(69)    Taylor Communications now maintains that Mr. Morris is not entitled to commissions for the NelNet, Inc. Services Agreement and, instead, that another employee is entitled to those commissions.

(70)    In the alternative to Mr. Morris' quantum meruit and unjust enrichment claims, to the extent the representations in Paragraph 67 were false when made and Taylor Communications, through its agents, knew that they were false when made, then Taylor Communications intended to deceive Mr. Morris by making those misrepresentations. Simply put, Taylor Communications knew that Mr. Morris would not be paid a commission, even though it told him he would.

(71)    Mr. Morris reasonably and justifiably relied on the representations by, among other things, continuing to work hard and sell as many products and services as possible for the benefit of Taylor Communications. Had Mr. Morris

11

known that he would not be paid what he was promised and what he reasonably expected, he would have worked differently at Taylor Communications, in commensuration with his actual compensation, and/or he would have sought another job that paid him what his efforts were worth.

(72) Mr. Morris was damaged by Taylor Communications' fraudulent statements in an amount exceeding $150,000.

## COUNT V: NEGLIGENT MISREPRESENTATION
### (Alternative Claim)

(73) Taylor Communications, through its agents, represented to Mr. Morris that Mr. Morris would be paid commissions for service agreements that he successfully executed with potential clients.

(74) Mr. Morris successfully executed a service agreement with NelNet., Inc.

(75) Taylor Communications now maintains that Mr. Morris is not entitled to commissions for the NelNet, Inc. Services Agreement and, instead, that another employee is entitled to those commissions.

(76) In the alternative to Mr. Morris' quantum meruit and unjust enrichment claims, to the extent the representations in Paragraph 73 were false when made, then Taylor Communications, through its agents, made such statements without exercising the care that a reasonable person would exercise in the circumstances.

(77) Taylor Communications made the representations with the knowledge and intention that Mr. Morris rely on the statements.

12

(78)   Mr. Morris reasonably and justifiably relied on the representations by, among other things, continuing to work hard and sell as many products and services as possible for the benefit of Taylor Communications. Had Mr. Morris known that he would not be paid what he was promised and what he reasonably expected, he would have worked differently at Taylor Communications, in commensuration with his actual compensation, and/or he would have sought another job that paid him what his efforts were worth.

(79)   Taylor Communications owed Mr. Morris a duty of care in making the representations.

(80)   Mr. Morris reasonably and justifiably relied on the representations of Taylor Communications.

(81)   Mr. Morris was damaged by Taylor Communications' negligent misrepresentations in an amount exceeding $150,000.

## COUNT VI: PUNITIVE DAMAGES

(82)   Plaintiff incorporates by reference herein the preceding paragraphs of this complaint.

(83)   The actions and conduct of Taylor Communications, as set forth herein, entitle Mr. Morris to compensatory damages, and are accompanied by aggravating factors which caused and relate to Mr. Morris' injuries which give rise to his claim for compensatory damages.

(84)   This conduct, as set forth herein, includes, among other things, fraud.

13

(85)    Taylor Communications facilitated the conduct constituting fraud and the willful, wanton, and outrageous conduct giving rise to punitive damages, as set forth herein and otherwise.

PRAYER FOR RELIEF WHEREFORE, Mr. Morris prays the Court for the following relief: 1. Mr. Morris have and recover from Taylor Communications for wrongful termination lost wages and the equitable relief of reinstatement, or in the alternative to reinstatement, front wages, in the amount of $2,000,000 or some other amount to be determined at trial, plus interest on the judgment until paid in full at the legal rate as allowed by law; 2. Mr. Morris have and recover from Taylor Communications for quantum meruit and/or unjust enrichment in an amount of $250,000, or some other amount to be determined at trial, plus interest on the judgment until paid in full at the legal rate as allowed by law; 3. in the alternative to the quantum meruit and unjust enrichment claims, for Mr. Morris to recover from Taylor Communications for fraudulent misrepresentation and/or negligent misrepresentation in the amount of $250,000, or some other amount to be determined at trial, plus interest on the judgment until paid in full at the legal rate as allowed by law; 5. that Mr. Morris be awarded punitive damages; 6. that all costs and attorneys' fees, of this action be taxed against Taylor Communications, and 7. that the Court award Mr. Morris such other and further relief as this Court may deem just and proper.

Trial by jury on all claims, including whether the matter is subject to arbitration, is demanded.

14

Respectfully submitted,

JAMES MATTHEW MORRIS

By _____
        Of Counsel

Thomas E. Strelka, Esq. (VSB# 75488)
L. Leigh R. Strelka, Esq. (VSB # 73355)
N. Winston West, IV, Esq. (VSB # 92598)
Brittany M. Haddox, Esq. (VSB # 86416)
Monica L. Mroz, Esq. (VSB #65766)
STRELKA EMPLOYMENT LAW
Warehouse Row
119 Norfolk Avenue, S.W., Suite 330
Roanoke, VA  24011
Tel:  540-283-0802
thomas@strelkalaw.com
leigh@strelkalaw.com
winston@strelkalaw.com
brittany@strelkalaw.com
monica@strelkalaw.com

*Counsel for Plaintiff*

15

# Exhibit 1

**TAYLOR COMMUNICATIONS**
**SECURE AND CUSTOMER SOLUTIONS, INC.**
**Technical Solution Consultant (TSC)**
**SALES COMPENSATION PLAN**
Effective: January 1, 2019 through December 31, 2019

This Sales Compensation Plan (the "Plan") is effective as of the first Effective Date and applies to all sales orders invoiced by Taylor Communications Secure and Customer Solutions, Inc. and its divisions and affiliates (the "Company") on or after the first Effective Date. This Plan supersedes any prior Sales Compensation Plan or similar arrangement relating to compensation for sales employees who are Technical Solution Consultants of the Company.

1.  Definitions:

    a.  "Authorized Products/Services" means the goods and services provided by the Company that the sales employee is authorized to sell.

    b.  "Bonus Period" means quarterly. There are four Bonus Periods each year:

    c.  "Bonus-Eligible Sales" means Net Sales of Authorized Products/Services for which the customer has actually paid the Company within the payment terms as detailed on the customer invoice.

    d.  "Gross Margin" means Net Sales minus Cost of Goods Sold (COGS).

    e.  "Net Sales" means gross sales, excluding pass thru sales, less:

        i.   any credit, allowance, or adjustment extended by the Company in its sole discretion;

        ii.  any collection or legal expense incurred by the Company in connection with any sales otherwise credited to the sales employee;

        iii. any postage, taxes or other expense paid to a third party which may be included in the invoice to the customer.

    f.  "Revenue" means Bonus-Eligible Sales.

    g.  "COGS" means the direct costs attributed to the production of goods and services sold by the Company.

2.  Basic Provisions:

    a.  The Company will pay a Salary in an amount determined by the Company. The Company will periodically review the amount of any Salary and may adjust the amount of such payment to reflect the performance of the employee.

    b.  Payments of Salary will be made at regular bi-weekly payroll intervals.

    c.  The Company will, subject to the provisions of this Plan, pay a Bonus to qualifying sales employee as set forth on Exhibit A.

    d.  In its discretion, the Company may pay an estimate of the Bonus based on invoiced sales during the bonus period. Any Bonus will generally be paid concurrently with the pay day following the Company's approval of the estimated Bonus payment. A Bonus is not earned until the final performance calculation has been completed and the final bonus paid. Sales employee must be employed by the Company at the time the final performance calculation has been completed and the final bonus is paid in order to receive the Bonus.

3.  Overpayments:

    a.  Overpayments may arise from situations in which a sales employee's estimated Bonus exceeds the Bonus actually earned. The Company may from time to time deduct any overpayments from Bonus in whole or in part.

    b.  Any remaining overpayments will be reconciled and settled within the plan year. Any overpayments still outstanding at year end will continue into the following plan year until recovered in full.

    c.  Upon termination of the sales employee's employment, whether voluntary or involuntary, the Company may offset any overpayments under this Plan against any amounts due to sales employee. By acknowledging and accepting compensation under this Plan, sales employee consents to any such offsets.

4.  Eligibility:

a. A sales employee is not eligible to receive any payment of compensation under this Plan if:

    (i) The sales employee has not executed a legally valid and enforceable Agreement on Intellectual Property, Confidential Information, Non-Solicitation and Non-competition in form and substance acceptable to the Company; or

    (ii) The sales employee is in breach of, or has threatened to breach, any fiduciary or other material obligation owed to the Company, including, without limitation, any obligations arising under any confidentiality or non-competition covenant by such sales employee in favor of the Company or its affiliates.

5. Expenses and Expense Reporting:

    a. The Company will reimburse sales employees for reasonable expenses related to the performance of their duties in accordance with the Company general policies and procedures related to such expenses.

    b. Sales employees must complete and submit expense reports together with appropriate supporting documentation in a timely manner as required by Company policies from time to time. The Company reserves the right to refuse reimbursement for expenses not reflected on timely and properly completed expense reports.

6. Modifications to the Plan/Adjustments to Payments.

    a. THE COMPANY IS THE ADMINISTRATOR OF THIS PLAN AND IS THE SOLE INTERPRETER OF ITS MEANING. THE COMPANY RETAINS THE RIGHT TO MODIFY OR ELIMINATE THIS PLAN, OR ANY OF ITS COMPONENTS, AT THE COMPANY'S SOLE DISCRETION. ANY MODIFICATIONS MAY APPLY TO ALL SALES EMPLOYEES OR ONLY SELECTED EMPLOYEES. MODIFICATIONS TO THE PLAN MAY INCLUDE, BUT ARE NOT LIMITED TO ITEMS SUCH AS INCREASES OR DECREASES IN THE MAXIMUM COMPENSATION PAYABLE TO A SALES EMPLOYEE, INCREASES OR REDUCTIONS IN THE AMOUNT OF ANY DRAW, INCREASES OR DECREASES TO COMMISSION RATES, REASSIGNMENT OF ACCOUNTS. MODIFICATIONS TO THE PLAN MAY APPLY TO INDIVIDUAL ACCOUNTS OR TO INDIVIDUAL JOBS OR THEY MAY APPLY TO A CLASS OF ACCOUNTS OR JOBS. THE COMPANY RESERVES THE RIGHT TO CREATE SPECIAL PROGRAMS. THE COMPANY WILL ATTEMPT TO NOTIFY SALES EMPLOYEES IN ADVANCE OF ANY MODIFICATIONS, BUT SUCH NOTICE MAY NOT ALWAYS OCCUR.

7. General Terms and Conditions:

    a. Sales employee may not assign or transfer, either voluntarily or involuntarily, any of his or her rights or benefits hereunder.

    b. Nothing in this Plan shall create any employment contract or modify the employment at will relationship between the sales employee and the Company.

    c. The Company retains the right to edit Plan provisions to correct typographical or mathematical errors.

    d. If the sales employee, with or without Company approval or authorization, sells any goods or services at prices below the Company's targeted pricing objectives, the Company may adjust the bonus payable or exclude the sales from Bonus- Eligible Sales in its sole discretion. If the sales employee sells any goods or services which the sales employee is not authorized to sell or at any price which the sales employee is not authorized to offer, the sales will be excluded from Bonus Eligible Sales.

    e. In the event the Company determines, in its sole discretion, that payment of a bonus would be inequitable based on an individual sales employee's performance, the Company reserves the right to reduce, modify or withhold a bonus payment.

    f. The Company reserves the right to re-assign accounts in its sole discretion for reasons including but not limited to operation efficiencies, customer preference, lack of attention to the account by the sales employee, lack of growth in the account, and allocation of work load. Upon re-assigning any account, the Company will re-state prior period sales applicable to the re-assigned account for both the former and new sales employee if either is covered by any compensation provision for which current period sales are compared to prior period sales.

g.  The Company may split bonuses among two or more sales employees in its sole discretion for reasons including but not limited to joint effort in attaining or servicing the account and transitioning the account from one sales employee to another.

h.  Following termination of employment, whether by the sales employee or the Company, sales employee will not earn any more bonuses. The Company will pay to sales employee the amount of any bonus, subject to the provisions of this Plan. Sales employee must be employed by the Company at the time the Bonus is paid in order to earn the Bonus.

i.  This Plan is governed by the laws of the State of Minnesota. In the event of any dispute the parties consent to the exclusive jurisdiction of the courts of the State of Minnesota and Federal Courts of the United States of America located in the District of Minnesota.

I have reviewed this Plan, including Exhibit A and have approved this Sales Compensation Plan.

Company: Taylor Communications Secure and Customer Solutions, Inc.

_____
Signature

___CHRO_____
Title (must be a corporate officer)

Carolyn Erickson
_____
Type or Print Name

Dated: May 16, 2019

I acknowledge receipt of the Sales Compensation Plan.

_____
Signature

_____
Sales Employee's Printed Name

Dated: __5/20/19_____, 2019

## EXHIBIT A

### TARGET BONUS

*Target Payout $50,000*
- $15,000, Revenue Retention Performance, adjusted based on Retention Book Size and Revenue Retention Performance
- $35,000 based on Signings Attainment Performance

### KEY MEASURES & DEFINITIONS

**Revenue Retention Performance Target** is established by multiplying the assigned YTD account revenue performance measured from OPTYMYZE by a factor of one half of one percent (0.005 %). This value becomes sales employee's YTD Revenue Retention Performance Target. This measurement is the roll up of actual revenue versus the prior year revenue for sales employee's assigned accounts.

**Signings Attainment Performance (Target of $35,000)** is sales employee's total Projected Annual Revenue of all approved WINs versus sales employee's Signings Quota.

**Signings Quota** is set in a range from $ 1,500,000 to $2,500,000 annually in relationship to fixed base pay.

**Customer Executed Documentation** includes a fully executed contract, purchase order, Letter of Intent, SOW (Statement of Work) or Scope Document (SD) outlining the Projected Annual Revenue (PAR). A fully executed contract is one that is signed and agreed to by both parties. The date the documentation is fully executed and signed (not the contract effective date) will determine the Plan year under which the contract is recognized for performance and bonus calculation purposes. Verbal acceptance or written intent to sign a contract is not considered fully executed and is not a basis for recognition under this Plan. To qualify, any proposed supporting customer executed documentation not reviewed and approved thru Legal must be supported by a purchase order(s), representing at least 10% of the projected annual revenue. Or, if invoice(s) are the only support then, in addition to representing at least 10% of the PAR, the invoice(s) must be paid in full to qualify.

**Projected Annual Revenue** is the anticipated annualized revenue as stated in the Customer Executed Documentation. If a multi-year Win indicates different revenue projections for each year, total projected revenue for the duration of the Win is averaged over Win length. The Projected Annual Revenue is used to calculate a Signing Advance. Actual Annual Revenue is used to calculate final bonus payment.

**Actual Annual Revenue** - For new accounts / acquisitions. the Actual Annual Revenue will include any/all new revenue for that customer pulled from the Data Warehouse. For new expansion business on an existing account, the Actual Annual Revenue will be based on any new additional revenue related to the solution / products sold, less the 6 month run rate history of that product / solution sold prior to the Win date. For Transactional Volume, Actual Annual Revenue will be the total of all Customer Executed Documentation submitted.

**Executed Strategic Account WINs** are defined as new business where sales employee is the primary individual supporting the sale (excludes AE's). To be considered a WIN and consequently eligible for the Signings Attainment Performance bonus:

a) Projected Annual Revenue must exceed $100,000 (individual or multiple WIN aggregation amount)
b) If multiple WINs needed to reach $100,000 minimum, all of the applicable WINs must be for a single customer (bill-to) and all recorded within annual bonus period.
c) WIN must be new Secure or Customer communications business that does not or will not replace or replicate previous business (same customer and same product type) within the previous year or Adhoc ( non-reoccurring) marketing communication projects earned each annual bonus period

d) Customer Executed Documentation must be provided
e) The Opportunity and WIN must be flagged using the WIN Form process in SalesForce.com
f) Account must be assigned to sales employee by the Director of Secure and Customer Solutions
g) Director of Secure and Customer Solutions must approve the WIN Form
h) Accounts signed with the involvement of another Technical Solution Consultant requires pre-approval of the Director of Secure and Customer Solutions to determine bonus split.

## PAYOUT FORMULA

**Revenue Retention Performance** payout will be determined based on sales employee's year-to-date achievement of sales employee's Revenue Quota attainment per Table 1 below.

Table 1

| Performance | Payout |
|---|---|
| 95-95.9% | 10% |
| 96-96.9% | 20% |
| 97-97.9% | 50% |
| 98-98.9% | 75% |
| 99-99.9% | 88% |
| 100-100.9% | 100% |
| 101-101.9% | 105% |
| 102-102.9% | 106% |
| 103-103.9% | 108% |
| 104-104.9% | 110% |
| 105-105.9% | 115% |
| 106-106.9% | 120% |
| 107-107.9% | 125% |
| 108-108.9% | 130% |
| 109-109.9% | 135% |
| 110-110.9% | 140% |
| 111.0% + | 150% |

**Signings Attainment Performance** is calculated per Table 2 below.

*Table 2*

*Table 2*

| Gross Margin % | <100% of Quota | 100% - 149.9% of Quota | >150% of Quota |
|---|---|---|---|
| >30% | 2.00% | 3.00% | 4.00% |
| 20% - 29.9% | 1.75% | 2.75% | 3.75% |
| 15% - 19.9% | 1.25% | 2.25% | 3.25% |
| Less than 15% | 0.25% | 0.25% | 0.25% |

**All >2 year deals,** with no termination for convenience clause in MSA for initial term, will pay at a rate of 130% of the rates noted in Table 2. If termination for convenience is included in MSA then standard rates apply (Table 2).

If the Win spans multiple quota levels, the payout percentage will be a hybrid of the rates tied to the dollars earned in each quota level.

**Signing Advance** - Up to 50% (maximum of $15,000) of the target bonus payout may be received as an advance payment toward the total target compensation goal of the Win. Signing Advance for WINS is based on the Projected Annual Revenue and anticipated GM expected at time of submission. The percentage payout rate will vary based on Win revenue percentage attainment of Quota at time of submission per chart above.

**Bonus Payout** - Actual Annual Revenue and Actual GM are used to calculate final bonus payout. The remaining bonus amount on any approved Win will be paid based on the revenue and GM generated in months 4 through 15 (from the Win date). The TSC has the option to receive bonus payout when the account has achieved the Projected Annual Revenue run rate over a 6 month period (i.e., if annual contract value is $1,000,000, the 6 month run rate would equal $500,000) by sending a request to Sales Administration. See Adjustments and Payment of Bonus Sections below if the Actual performance is less than Projected.

Examples:

Sales employee signs a 1 year Win of $500,000 with expected GM of 32%. Sales employee is currently below 100% of signings quota attainment. Bonus rate applied to this deal will be 2%.

Sales employee has a 3 year. $1,000,000/year Win. Account is expected to generate 25% GM. Bonus rate in this example would be 1.75%, since sales employee has not reached 100% of quota. The Target Bonus Payout would be $17,500, of which $8,750 would be paid as a Signing Advance, with the remaining bonus amount paid within 15 months.

Sales employee submitted a 2-year Win with Projected Annual Revenue of $900,000 at 32% GM and is currently 105% of quota for the year. Signing Advance is capped at 50% or $13,500 ($900,000 X 3% = $27,000/2). During the first 15 month period, the account achieves run rate. Remaining bonus payout is $13,500 ($900,000 x 3% = $27,000 less $13,500 initial payment = $13,500).

Sales employee submitted a 3-year Win (No convenience termination) with Projected Annual Revenue of $800,000 at 35% GM and is currently 105% of quota for the year. Signing Advance capped at $15,000 ($800,000 X 3% X 1.30 = $31,200 / 2). During the first 15 month period, the account achieves run rate. Remaining bonus payout is $16,200($800,000 x 3% = $31,200 less $15,000 initial payment = $16,200).

## ADJUSTMENTS AND REVISIONS TO PROJECTED CONTRACT REVENUE

This Plan relies upon projections and estimates of the annual revenue and value of WINS executed during the Plan year in determining performance levels and bonus awards. These projections are subject to both upward and downward revisions during the Plan year based upon a material change to the Projected Annual Revenue of the Win discovered in a subsequent period. Contracts that are signed and then terminated within one year will be removed from the year to date performance calculation and no additional bonus paid. Management has the sole right and discretion to adjust and revise the projected revenue value of a contract at any time. The Company reserves the right to recoup any Signing Bonus Advance overpayment.

## PAYOUT FREQUENCY

Revenue Retention Bonus to be paid quarterly, based upon YTD Revenue Retention Performance. Quarterly bonus payments will be estimated and paid based upon YTD performance (e.g., bonus missed in one quarter can be made up in later quarters of the year). Quarterly payments are capped at 100% attainment threshold. Attainments over 100% will be paid out annually.

The Signing Attainment Performance Bonus generally will be paid concurrent with the pay day following the Company's approval of the Bonus payment.

## PLAN ADMINISTRATION – Revenue Retention Performance

Percentage calculations will be rounded to the nearest 1/10th percent (0.1%) and dollar calculations and bonus payments are rounded to whole dollars.

Bonus is not earned until the final performance calculation has been completed and the final bonus paid.

Final bonus payments will be adjusted for: unpaid invoices, chargeable claim amounts, customer terminated orders, sales reversals and to satisfy any deficit balance resulting from prior draws or advances on bonus payments.

Employee who is in the position less than 12 full months will have the bonus prorated based on the number of months in the position. The bonus will be calculated based on the performance of the time period in the job.

# Exhibit 2

## Morris, Jim

| | |
|---|---|
| **From:** | Merickel, Thomas D |
| **Sent:** | Thursday, February 13, 2020 3:25 PM |
| **To:** | Crump, Jeff; Robinson, Michael; Drenning, Susan; Mullikin, Nathan A; Braddock, Tommie |
| **Cc:** | Whitaker, Charles E.; Erickson, Carolyn M; La Mere, Denise; Herring, Blake; Fellows, Mardi; Conzett, Mary Beth; Lancaster, Tricia M |
| **Subject:** | Important Sales Compensation Update |

*This message is being sent to all Sales Compensation Plan Participants.*

The purpose of this communication is to update you on decisions regarding your 2019 sales compensation plan and your 2020 sales compensation plan details.

### 2019 Q4 Bonus Attainment and Q4 Gross Margin Attainment Payments:

- Payouts are currently under review.
- Pursuant to the terms of the sales compensation plans, further payments are suspended pending the completion of an audit of the relevant calculations and source data.
- Following the results of this work, any decisions made will be communicated to you in a timely manner.

### Expected Timing:

We expect to begin reviewing the detail of recommended 2019 disbursements by sales manager and sales employee in the next day or two and comparing it to the terms and conditions of the multiple plans and special programs that they are based upon. We will work quickly to conclude our review within the next two weeks. You can expect an update from us as soon as that review is complete, indicating what the path forward will be to resolve this matter.

### 2020 Sales Incentive Compensation Plan Details:

- We are redesigning our sales compensation plans to regain sustainable profitability in our organization.
- Any plans that have been issued are withdrawn.
- We anticipate finalizing and issuing 2020 sales incentive plans as soon as reasonably possible.
- Plans will be retroactive to January 1, 2020 and paid out accordingly.

Please reach out to your sales leadership with any questions.

Respectfully,

# TAYLOR

**Tommy Merickel** – *Chief Sales Officer*
Taylor Corporation
10050 Crosstown Circle, Suite 200, Eden Prairie, MN 55344
Office: 952-932-7995 | Mobile: 612-889-8090
tdmerickel@taylorcorp.com | www.taylorcorp.com

# Exhibit 3

# Taylor Communications Secure & Customer Solutions, Inc.
## SALES COMPENSATION PLAN
Effective Dates: January 1, 2020 through December 31, 2020

This Sales Compensation Plan (the "Plan") is effective as of the first Effective Date and applies to all sales orders invoiced by the entity(ies) and/or accounting unit(s) specified on Exhibit A ("Compensation Schedule") (the "Company") on or after the first Effective Date. This Plan supersedes any prior Sales Compensation Plan or similar arrangement relating to compensation for sales employees of the Company.

1. Definitions:

   a. "Affiliated Sales Assistance" means that one or more Company affiliated sales representative(s) either: (1) introduced the customer or opportunity generating Commissionable Sales to Participant; or (2) materially contributed to the generation of Commissionable Sales received by Company, as determined by Company in its sole discretion.

   b. "Aggregate Commissionable Sales" means the total Commissionable Sales for each of the sales representatives reporting to the designated participant.

   c. "Authorized Products/Services" means the goods and services provided by the Company that the Participant is authorized to sell.

   d. "Commission" means compensation for Participant calculated as a percentage of the Commissionable Sales of Authorized Products/Services generated by the Participant and accepted by the Company during the term of this plan.

   e. "Commission Period" means a calendar quarter. There are four Commission Periods each year: January 1 through March 31 ("1Q20"), April 1, through June 30 ("2Q20"), July 1 through September 30 and October 1 ("3Q20"), through December 31 ("4Q20").

   f. "Commissionable Sales" means Net Sales originated by the Participant for which the customer has actually paid the Company within one-hundred fifty (150) days of the date of the invoice. *[Note to Participants: This is anticipated to decrease to ninety (90) days in 2021.]* Commissionable Sales with respect to the Prior Year means as defined by the terms of the sales compensation plans applicable to the Prior Year.

   g. "Contract" means an agreement for services signed by the customer and the Company or a purchase order accepted by the Company.

   h. "Draw" means an amount, established by the Company from time to time in its sole discretion, payable to a Plan participant as an advance against Commissions to be earned pursuant to this Plan.

   i. "Estimated Commissions" means the Company's reasonable estimate of Commissions paid periodically subject to reconciliation when actual calculations of Commission are completed including, but not limited to, any adjustment for:

      i. Estimates of Commissionable Sales which later are determined to be non-commissionable due to untimely payment by customer or otherwise;

      ii. Mathematical or data errors; or

      iii. Improperly crediting Commissionable Sales to Participant.

   j. "Implementation Date" means the date the customer's program as described in the Contract launches, as determined by the Company in its sole discretion.

   k. "Net Sales" means gross sales, excluding pass thru sales and sales to an affiliate, less:

i.   any credit, allowance, or adjustment extended by the Company in its sole discretion;

ii.  any collection or legal expense incurred by the Company in connection with any sales otherwise credited to the Participant;

iii. any postage, freight, taxes or other expense paid to a third party which may be included in the invoice to the customer.

l.   "New Commissionable Sales" means Commissionable Sales to a customer during the 24 calendar months immediately following the first Commissionable Sale to that customer.

m.  "Participant" means the individual employee whose name and signature appears below.

n.   "Plan Year" means January 1, 2020 through December 31, 2020.

o.   "Prior Year" means January 1, 2019 through December 31, 2019.

p.   "Projected Commissionable Sales" means, solely with respect to Contracts executed prior to the Plan Year, the anticipated Commissionable Sales as stated in the Contract or as stated on the WIN form in SFDC and approved by the business unit performing the work. If a multi-year Contract/WIN indicates different revenue projections for each year, the total Projected Commissionable Sales for the duration of the Contract is averaged over the Win length. The Projected Annual Revenue is used only to calculate a Signing Advance.

q.   "Salary" means a fixed amount of compensation paid periodically for performance by Participant.

2.   Basic Provisions:

a.   The Company may pay a Salary in an amount determined by the Company. The Company will periodically review the amount of any Salary and may adjust the amount of such payment to reflect the performance of the Participant.

b.   Payments of Salary will be made at regular bi-weekly payroll intervals.

c.   The Company may pay a Draw in an amount determined by the Company. The Company will periodically review the amount of any Draw and may adjust the amount of such payment to reflect the performance of the Participant.

d.   Payments of Draw will be made at regular bi-weekly payroll intervals.

e.   The Company will, subject to the provisions of this Plan, pay Commissions to Participant.

3.   Reconciliation:

a.   Estimated Commissions will generally be calculated and paid concurrent with the second pay day following the end of a Commission Period. *For clarity, Commissions are earned when the customer pays for the goods, provided payment is received within 150 days of invoice date.* The Company will create this estimate by applying the applicable commission rates to the sales that are invoiced to customers and recognized as revenue by the Company during the previous Commission Period, even if the invoice has not yet been paid.

b.   Overpayments may arise from situations in which a sales employee's Draw or Estimated Commissions exceed the Commissions actually earned. The Company may from time to time deduct any overpayments from Commissions or other amounts due from Company to Participant, in whole or in part.

c.   The amount and timing of re-payment will be established by the Company.

d. Upon termination of the Participant's employment, whether voluntary or involuntary, the Company may offset any overpayments under this Plan against any amounts due to Participant. By acknowledging and accepting compensation under this Plan, Participant consents to any such offsets.

4. Eligibility:

   a. Participant is not eligible to receive any payment of compensation under this Plan if:

      (i) Participant has not executed a legally valid and enforceable Agreement on Intellectual Property, Confidential Information, Non-Solicitation and Non-competition in form and substance acceptable to the Company; or

      (ii) Participant is in breach of, or has threatened to breach, any fiduciary or other material obligation owed to the Company, including, without limitation, any obligations arising under any confidentiality or non-competition covenant by such Participant in favor of the Company or its affiliates.

   (b) If Participant receives a Draw, Participant is ineligible for Paid Time Off (PTO), unless paid sick time is required by applicable law.

5. Expenses and Expense Reporting:

   a. The Company will reimburse Participant for reasonable expenses related to the performance of their duties in accordance with the Company general policies and procedures related to such expenses.

   b. Participant must complete and submit expense reports together with appropriate supporting documentation in a timely manner as required by Company policies from time to time. The Company reserves the right to refuse reimbursement for expenses not reflected on timely and properly completed expense reports.

6. Modifications to the Plan/Adjustments to Commission Payments.

   a. THE COMPANY IS THE ADMINISTRATOR OF THIS PLAN AND IS THE SOLE INTERPRETER OF ITS MEANING. THE COMPANY RETAINS THE RIGHT TO MODIFY OR ELIMINATE THIS PLAN, OR ANY OF ITS COMPONENTS, AT THE COMPANY'S SOLE DISCRETION. ANY MODIFICATIONS MAY APPLY TO ALL SALES EMPLOYEES OR ONLY SELECTED EMPLOYEES. MODIFICATIONS TO THE PLAN MAY INCLUDE, BUT ARE NOT LIMTED TO ITEMS SUCH AS INCREASES OR DECREASES IN THE MAXIMUM COMPENSATION PAYABLE TO A SALES EMPLOYEE, INCREASES OR REDUCTIONS IN THE AMOUNT OF ANY DRAW, INCREASES OR DECREASES TO COMMISSION RATES, AND REASSIGNMENT OF ACCOUNTS. MODIFICATIONS TO THE PLAN MAY APPLY TO INDIVIDUAL ACCOUNTS OR TO INDIVIDUAL JOBS OR THEY MAY APPLY TO A CLASS OF ACCOUNTS OR JOBS. THE COMPANY RESERVES THE RIGHT TO CREATE SPECIAL PROGRAMS. THE COMPANY WILL ATTEMPT TO NOTIFY SALES EMPLOYEES IN ADVANCE OF ANY MODIFICATIONS, BUT SUCH NOTICE MAY NOT ALWAYS OCCUR.

7. General Terms and Conditions:

   a. Participant may not assign or transfer, either voluntarily or involuntarily, any of his or her rights or benefits hereunder.

   b. Nothing in this Plan shall create any employment contract or modify the employment at will relationship between the Participant and the Company.

   c. The Company retains the right to edit Plan provisions to correct typographical or mathematical errors.

d. No employee receiving an hourly wage is eligible for any compensation under this Plan.

e. If Participant, with or without Company approval or authorization, sells any goods or services at prices below the Company's targeted pricing objectives, the Company may adjust the Commission payable or exclude the sales from Commissionable Sales in its sole discretion. If Participant sells any goods or services which Participant is not authorized to sell or at any price which Participant is not authorized to offer, the sales will be excluded from Commissionable Sales. If Participant, without Company pre-approval, sells goods or services that Company affiliates have the capability to manufacture or provide, but are outsourced to non-Company affiliates, those sales will be excluded from Commissionable Sales.

f. In the event the Company determines, in its sole discretion, that payment of a commission would be inequitable based on an individual participant's performance, the Company reserves the right to reduce, modify or withhold a commission payment.

g. The Company reserves the right to re-assign accounts in its sole discretion for reasons including but not limited to operation efficiencies, customer preference, lack of attention to the account by Participant, lack of growth in the account, and allocation of work load. Upon re-assigning any account, the Company will re-state prior period sales applicable to the re-assigned account for both the former and new sales employee if either are covered by any compensation provision for which current period sales are compared to prior period sales.

h. The Company may split commissions among two or more sales employees in its sole discretion for reasons including but not limited to joint effort in attaining or servicing the account and transitioning the account from one sales employee to another.

i. Following termination of employment, whether by Participant or the Company, Participant will not earn any more commissions or Draw. The Company will reconcile Participant's earned commissions with any overpayments. The Company will pay to Participant the amount by which the earned commissions as of the termination date exceed any overpayments. Participant must repay any overpayment upon termination of employment. The company may withhold the amount of overpayments from any sums owed to Participant at termination. A Commission is deemed "earned" when the customer pays for the goods or services within one-hundred fifty (150) days of the date of the invoice.

j. Unless prohibited by applicable law, this Plan is governed by the laws of the State of Minnesota. In the event of any dispute the parties consent to the exclusive jurisdiction of the courts of the State of Minnesota and Federal Courts of the United States of America located in the District of Minnesota.

The Company and the Participant have read and acknowledge their agreement to the terms of this Sales Compensation Plan, including the Compensation Schedule.

**Manager: Angela Passanesi**

_____
Signature

Dated: _____

**Chief Sales Officer: Tommy Merickel**

_____
Signature

Dated: _____

**Group President: Tommie Braddock**

_____
Signature

Dated: _____

**Participant:**

_____
Signature

Dated: _____

EXHIBIT A –

**Participant:**
**Entity/Accounting Unit: Taylor Communications Secure & Customer Solutions, Inc.**

1. **Growth Commission.**

   a. If the Commissionable Sales for the Plan Year exceeds the Commissionable Sales for the Prior Year ("YOY Growth"), Participant will be eligible for a Growth Commission as follows:

      i. If Participant generated the YOY Growth alone without Affiliated Sales Assistance, Participant is eligible for a Growth Commission equal to four percent (4%) of the YOY Growth; or

      ii. If Participant generated the YOY Growth with Affiliated Sales Assistance, Participant is eligible for Growth Commission equal to two percent (2%) of the YOY Growth.

   b. In the event that YOY Growth is generated both with and without Affiliated Sales Assistance, Growth Commission will be calculated on a pro-rata basis as determined by Company in its sole discretion.

2. **Estimated Commission.**

   a. No Estimated Commissions will be paid for 1Q20.

   b. If YOY Growth is on pace to be positive as of the end of 2Q20 (50%) or 3Q20 (75%), Participant will be eligible to receive Estimated Commissions equal to the pro rata portion of the Growth Commission.

3. **Salary**

   a. Participant will receive a Salary as established by Company.



**STRELKA
EMPLOYMENT
LAW**

PROTECTING EMPLOYEE RIGHTS

Thomas E. Strelka
thomas@strelkalaw.com

L. Leigh R. Strelka
leigh@strelkalaw.com

Jacqueline B. Chaffee
jacqueline@strelkalaw.com

N. Winston West IV
winston@strelkalaw.com

Brittany M. Haddox
brittany@strelkalaw.com

Monica L. Mroz
monica@strelkalaw.com

CL20-1963

September 1, 2020

*Via Hand-Delivery*

Brenda S. Hamilton, Clerk
Roanoke City Circuit Court
315 West Church Avenue
Roanoke, VA 24010

CIRCUIT COURT
Received & Filed
4:26pm
SEP 0 1 2020
By _____
Deputy Clerk
CITY OF ROANOKE

Re:   *James Matthew Morris v. Taylor Communications Secure & Customer
Solutions, Inc., et al.*

Dear Clerk Hamilton,

Enclosed for filing is an original complaint. My law firm represents the plaintiff, James Matthew Morris. Also enclosed is a civil filing sheet, a filing fee check in the amount of $351.00, and four (4) additional copies of the complaint. Please stamp one copy of the complaint for our records and prepare the three others for service upon each of the defendants. The service copies can be returned to our office to my attention using the enclosed UPS mailer.

Please let me know if you have any questions. Thank you.

Sincerely,

Brittany M. Haddox

/tm
Enclosures

cc:   Leigh Strelka, Esq. (via electronic mail leigh@strelkalaw.com)
James Morris (via electronic mail)

540.283.0802   •   Warehouse Row, 119 Norfolk Avenue, SW, Suite 330, Roanoke, VA 24011   •   www.strelkalaw.com