IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

JAMES MATTHEW MORRIS,       )
                                  )
      Plaintiff,              )
                                  )     Civil Action No. 7:20CV00604
v.                              )
                                  )     **MEMORANDUM OPINION**
TAYLOR COMMUNICATIONS SECURE  )
& CUSTOMER SOLUTIONS, INC.,      )
VENTURE SOLUTIONS, INC., and     )     By: Hon. Glen E. Conrad
TAYLOR CORPORATION,           )     Senior United States District Judge
                                  )
      Defendants.           )

Plaintiff James Matthew Morris has filed the present action against Taylor Communications Secure & Customer Solutions, Inc., Venture Solutions, Inc., and Taylor Corporation (hereinafter "the defendants" or "Taylor") seeking to recover unpaid commissions and bonuses. Taylor has moved to dismiss Morris's complaint in its entirety for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Taylor also requests that the court transfer any surviving claims to the United States District Court for the District of Minnesota pursuant to a forum selection clause. On November 17, 2020, the court held a telephonic hearing on the motion. The motion has been fully briefed and is ripe for review.

### Background

James Matthew Morris is a 61-year-old Virginia resident who previously worked for Taylor Communications Secure & Customer Solutions. (Compl. ¶¶ 1, 8, 9.) Morris began working for Taylor as a Technical Solutions Consultant in June 2015 after Taylor purchased the company Morris was then working for. (Id. ¶ 10.) As a Technical Solutions Consultant, Morris was responsible for working with potential clients to assess their needs, create solutions for those needs,

and then obtain the clients' signatures on service agreements and statements of work setting forth the work that Taylor agreed to perform and the funds the clients would pay for those services. (Id. ¶ 12.)

Taylor terminated Morris's employment on April 6, 2020. (Id. ¶ 14.) Morris attests that Taylor "falsely stated that Mr. Morris' employment was terminated due to financial hardships created by COVID-19." (Id. ¶ 15.) He maintains that he continued to procure new business for Taylor until his termination, and his division met its goals for Q1 2020 as it generated some 30% of Taylor's total new revenue. (Id. ¶¶ 16–17.) Morris also asserts that Taylor gave him a positive performance review soon before his termination. (Id. ¶ 18.) Prior to his termination, he received a salary along with bonuses and commissions. (Id. ¶ 20.)

Morris contends that Taylor terminated him because of his age and so that Taylor could avoid paying him commissions. (Id. ¶ 19.) Taylor maintains an annual Sales Compensation Plan that sets the calculations for commissions and bonuses for consultants. (Id. ¶ 24.) Morris asserts that under Taylor's 2019 Sales Compensation Plan, he earned the $15,000 Revenue Retention Performance Target Bonus. (Id. ¶ 26.) However, on February 13, 2020, Taylor informed Morris that the 2019 payouts were under review, and "[p]ursuant to the terms of the sales completion plans, further payments [were] suspended pending the completion of an audit of the relevant calculations and source data." (Id. ¶ 27.)

To this end, the 2019 Sales Compensation Plan includes a clause giving Taylor "the right to modify or eliminate this plan, or any of its components, at [Taylor's] sole discretion." (Compl. Ex. 1 at 2.) The 2019 Sales Compensation Plan also stipulates that (1) in the event an employee is terminated, the employee "will not earn any more bonuses" and (2) the employee "must be employed by [Taylor] at the time the Bonus is paid in order to earn the Bonus." (Compl. Ex. 1 at

2

3.)  The 2020 Sales Compensation Plan includes similar language.  (Compl. Ex. 3 at 3–4.)  Both Morris and Taylor signed the 2019 Sales Compensation Plan.  (Compl. Ex. 1 at 3.)  Morris attests that Taylor still has not paid him the $15,000 bonus he earned pursuant to the 2019 Sales Compensation Plan.  (Compl. ¶ 28.)

Before his April 6, 2020, termination, Morris was waiting on Taylor to publish its 2020 Sales Compensation Plan.  (Id. ¶ 29.)  Morris asserts that Taylor informed him that once it published its 2020 Sales Compensation Plan, the 2020 Plan would be effective retroactive to January 1, 2020.  (Id. ¶ 30.)  Moreover, in mid-March 2020, Angela Passanesi, Taylor's Vice President of Sales, informed Morris that the 2020 Sales Compensation Plan was nearly finalized.  (Id. ¶ 31.)  Passanesi told Morris that the 2020 Sales Compensation Plan as discussed would award commissions for each service agreement an employee secured with a client as follows: 6% of revenue for the first year of the service agreement, 3% of revenue for the second year, and 1% of revenue for the third year.  (Id. ¶ 32.)  Taylor ultimately published its 2020 Sales Compensation Plan after it terminated Morris.  (Id. ¶ 41.)

Morris asserts that he was responsible for NelNet, Inc., signing a service agreement and statement of work with Taylor on February 10, 2020 (the "NelNet Service Agreement").  (Id. ¶ 33.)  This was a larger-than-average deal for Taylor, and Morris worked on the matter for approximately one year prior to its execution "under the understanding, and based on representations by Taylor Communications, that Mr. Morris would be paid a significant commission" for his work.  (Id. ¶¶ 34–36.)  Taylor also allegedly informed Morris that it would pay him a commission once Taylor executed the master services agreement and statement of work with NelNet.  (Id. ¶ 37.)  Both were executed on February 10, 2020.  (Id.)

Morris contends that had the 2019 Sales Compensation Plan been in effect for 2020, Taylor would have owed him approximately $180,000 for his work on the NelNet Service Agreement. (Id. ¶ 38.) Alternatively, had the 2020 Sales Compensation Plan that Passanesi described to Morris instead controlled, Taylor would have owed Morris approximately $600,000, over three years, for his work on the NelNet Service Agreement. (Id. ¶ 39.) Under the 2020 Sales Compensation Plan ultimately published, Morris would have received approximately $224,000 from Taylor. (Id. ¶ 43.) Morris has received no commission from Taylor for his work on the NelNet Service Agreement. (Id. ¶ 44.)

Morris also asserts that at the time of his termination, he was working on a service agreement with Bank of America that would have earned him a commission of $150,000 under the 2019 Sales Compensation Plan. (Id. ¶ 45.) Morris would have earned a larger commission under the 2020 Sales Compensation Plan, he maintains. (Id.) Taylor has not paid Morris a commission for his work on the Bank of America deal. (Id. at ¶ 46.)

When Taylor notified Morris of his termination, Passanesi, his supervisor, informed Morris that she would help ensure he receive the commissions Taylor owed him. (Id. ¶ 47.) When Taylor terminated Morris, it offered him a Settlement Agreement and General Release of all Claims that attempted to have Morris waive his rights to be paid the commissions and bonuses Taylor owed him. (Id. ¶ 49.) Morris refused to sign the agreement. (Id. ¶ 50.) Morris contends that Taylor terminated him to avoid paying him the commission it owed him for his work on the NelNet Service Agreement, the bonus Taylor owed him pursuant to the 2019 Sales Compensation Plan, and the commission Morris "was in the process of earning for the Bank of America deal." (Id. ¶ 48.)

## Procedural History

Morris originally filed his action in Virginia state court, raising six counts in his complaint: (1) a wrongful discharge <u>Bowman</u> claim, (2) quantum meruit, (3) unjust enrichment, (4) fraudulent misrepresentation, (5) negligent misrepresentation, and (6) punitive damages.   Taylor then removed the case to federal court based on diversity of citizenship jurisdiction.  On September 30, 2020, Taylor filed a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  The court held a telephonic hearing on the motion on November 17, 2020.

## Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted.  When deciding a motion to dismiss under this rule, the court must accept as true all well-pled allegations and draw all reasonable factual inferences in the plaintiff's favor.  <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (internal citation and quotation marks omitted).  To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 570).

## Discussion

Taylor seeks dismissal of each count of Morris's complaint for failure to state a claim under Rule 12(b)(6).  Should any claim survive the motion, Taylor requests that the court transfer the

case to the United States District Court for the District of Minnesota pursuant to a forum selection clause in the 2019 Sales Compensation Plan.

## I.    COUNT I: WRONGFUL DISCHARGE

Count I to Morris's complaint seeks recovery under a wrongful discharge "Bowman claim." Taylor first asserts that Morris's Bowman claim cannot withstand its motion to dismiss because it does not state a claim under Minnesota law. But even if Virginia law does apply, Count I still does not adequately state a claim for relief under Rule 12(b)(6), Taylor argues. For the foregoing reasons, the court agrees that Morris's Bowman claim does not state a claim under Virginia law.

"Virginia adheres to the employment at-will doctrine, which allows . . . the employer . . . to terminate the employment relationship without the need to articulate a reason." Francis v. Nat'l Accrediting Comm'n of Career Arts & Scis., Inc., 796 S.E.2d 188, 190 (Va. 2017) (quotation marks and alterations omitted). In three "narrow" and "limited circumstances" referred to as the "Bowman exceptions," the Virginia Supreme Court has recognized claims for being fired in violation of public policy. Id. at 190–91. The three exceptions are: (1) when "an employer violated a policy enabling the exercise of an employee's statutorily created right"; (2) when "the public policy violated by the employer was explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy"; and (3) when "the discharge was based on the employee's refusal to engage in a criminal act." Id. A plaintiff seeking to assert a Bowman claim must identify a Virginia statute that confers rights or duties upon him. Briggman v. Nexus Servs., No. 5:18-cv-00047, 2018 U.S. Dist. LEXIS 209212, at *9 (W.D. Va. Dec. 11, 2018) (Urbanski, C.J.).

Morris brings his wrongful discharge claim under the second <u>Bowman</u> exception pursuant to the Virginia Wage Payment Act, Va. Code § 40.1-29.[1]  Specifically, Morris asserts that Taylor terminated him to avoid paying him commissions and bonuses it owed Morris and thus "in violation of the public policy underlying" the Virginia Wage Payment Act.  (Compl. ¶¶ 53–55.)  The Virginia Wage Payment Act "prohibits an employer from withholding any part of an employee's wages, except for taxes, without the employee's permission."  <u>Gerald v. Diversified Prot. Corp.</u>, No. 1:18-cv-1154, 2019 U.S. Dist. LEXIS 106660, at *13–14 (E.D. Va. June 25, 2019).  Morris seeks unpaid wages, lost wages from the date of the loss of his employment through the date of trial, and to be reinstated to his former position at Taylor, or in the alternative, to recover front wages due to the wrongful discharge.

This court and the United States District Courts for the District of Columbia and the Eastern District of Virginia have all adjudicated <u>Bowman</u> claims brought under the Virginia Wage Payment Act.  In <u>Vasquez v. Whole Foods Market, Inc.</u>, the District of Columbia district court concluded after reviewing Virginia caselaw that the Virginia Wage Payment Act confers no right on employees to receive pay.  302 F. Supp. 3d 36, 56 (D.D.C. 2018).  Thus, "an aggrieved employee can pursue his private civil action based on claims of breach of contract or <u>quantum meruit</u>"—and not via a <u>Bowman</u> claim.  <u>Id.</u> at 57 (quoting <u>Mar v. Malveaux</u>, 732 S.E.2d 733, 738 (Va. Ct. App. 2012)) (internal alterations omitted).  The court therefore held that "each plaintiff's termination <u>itself</u> did not violate public policy" and dismissed the plaintiffs' <u>Bowman</u> claims with prejudice.  <u>Id.</u> at 57–58.

---

[1] The court notes that the Virginia Wage Payment Act was amended on July 1, 2020.  However, because (1) Taylor terminated Morris on April 6, 2020, and (2) "[t]he presumption in Virginia is against retroactive application of statutes," the court will accordingly apply the pre-amendment statute.  <u>Berner v. Mills ex rel. Estate of Mills</u>, 560 S.E.2d 925, 927 (Va. Ct. App. 2002) (citation omitted).

In Briggman v. Nexus Servs., this court expressed agreement with Vasquez and accordingly concluded that the plaintiffs' termination "did not violate a policy enabling the exercise of an employee's statutorily created right as is necessary to establish a Bowman claim" under the second Bowman exception. 2018 U.S. Dist. LEXIS 209212, at *14–15 (alteration and quotation marks omitted). Finally, in Gerald v. Diversified Prot. Corp., the Eastern District of Virginia adopted a report and recommendation concluding that the plaintiff could not assert a valid Bowman claim under the Virginia Wage Payment Act. 2019 U.S. Dist. LEXIS 106660, at *13–14. Citing to both Vasquez and Briggman, the court agreed that "there is no correlative policy in the Act that protects an employee's exercise of her right to receive wages" and dismissed the Bowman claim with prejudice. Id. at *15 (quoting Vasquez, 2018 U.S. Dist. LEXIS 209212 at *6) (quotation marks omitted).

Against this backdrop, the court concludes that Morris's Bowman claim cannot survive the motion to dismiss. Specifically, the court agrees that the Virginia Wage Payment act neither "protect[s] an employee's exercise of [his] right to receive wages" nor "set[s] forth an explicit public policy necessary to prosecute a Bowman claim" pursuant to the second Bowman exception. Briggman, 2018 U.S. Dist. LEXIS 209212, at *10 (alteration and quotation marks omitted). Morris's wrongful discharge Bowman claim therefore fails as a matter of law. And given the caselaw already addressing the applicability of Bowman to the Virginia Wage Payment Act, the court will reject Morris's request that the court certify the issue to the Supreme Court of Virginia. The court will accordingly dismiss count I with prejudice.

II.    **COUNTS II & III: QUANTUM MERUIT AND UNJUST ENRICHMENT**

Taylor next contends that Morris's implied contract claims for unjust enrichment and quantum meruit fail under both Minnesota and Virginia law because "the subject matter of the

dispute is governed by an express contract." (Def's Mem. Supp. Mot. Dismiss, ECF No. 6, at 9.) For the following reasons, the court disagrees, and will deny Taylor's motion to dismiss as to Counts II and III.

### a.    Choice of Law

As a preliminary matter, Taylor asserts that the court must apply Minnesota law to Morris's quantum meruit and unjust enrichment claims because "the parties agreed that Minnesota law governs any claims related to compensation." (Def's Mem. Supp. Mot. Dismiss at 2–3.) Both the 2019 and 2020 Sales Compensation Plans governing the bonuses and commissions presently at issue dictate that "[u]nless prohibited by applicable law, this Plan is governed by the laws of the State of Minnesota." (Compl. Ex. 1 at 3; Compl. Ex. 3 at 4.) Moreover, "[i]n the event of any dispute the parties consent to the exclusive jurisdiction of the courts of the State of Minnesota and federal courts of the United States of America located in the District of Minnesota." (Id.)

Morris, however, argues that the clause Taylor cites to is invalid because the Sales Compensation Plans in which it lies lack the consideration necessary to form an enforceable contract. (Pl.'s Memo. Opp. Mot. Dismiss, ECF No. 9, at 17.) As support, Morris points to a clause in the 2019 Sales Compensation Plan giving Taylor "the right to modify or eliminate this plan, or any of its components, at [Taylor's] sole discretion." (Id.) (quoting Compl. Ex. 3.) Additionally, Morris attests that the 2019 Sales Compensation Plan "specifically notes that it is not an employment contract," meaning that the choice of law provision "cannot be construed to control other claims brought by Mr. Morris concerning his former employment with Taylor Communications." (Id. at 18 n.4.)

Federal courts sitting in diversity must apply the choice of law rules of the forum state—in this case, Virginia. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496–97 (1941).

Virginia enforces contractual choice of law provisions, "giving them full effect except in unusual circumstances." Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 624 (4th Cir. 1999) (citing Tate v. Hain, 25 S.E.2d 321, 324 (Va. 1943)). However, where two bodies of law do not differ in any material respect, a choice of law analysis is ultimately unnecessary, and courts apply the law of the forum in which they sit. See Perini/Tompkins Jt. Venture v. Ace Am. Ins. Co., 738 F.3d 95, 101 (4th Cir. 2013). For the following reasons, the court will apply Virginia law.

First, as explained in more detail below, the Fourth Circuit has concluded that agreements similar to both the 2019 and 2020 Sales Compensation Plans do not constitute enforceable contracts. See Jensen v. Int'l Bus. Mach. Corp., 454 F.3d 382, 388 (4th Cir. 2006). Given the 2019 and 2020 Sales Compensation Plans' unenforceability, Taylor cannot rely on their choice of law clause.

Second, the court notes that Minnesota and Virginia law governing quantum meruit and unjust enrichment do not appear to differ materially. Under Virginia law, a claim for quantum meruit is established "where service is performed by one, at the instance and request of another, and ... nothing is said between the parties as to compensation for such service." T. Musgrove Constr. Co. v. Young, 850 S.E.2d 337, 340–41 (Va. 2020). Minnesota similarly stipulates that "[a] party may recover under quantum meruit where he or she has conferred a benefit to another and has not received reasonable compensation for this act." Busch v. Model Corp., 708 N.W.2d 546, 552 (Minn. Ct. App. 2006). As to unjust enrichment, Virginia law provides that such a claim "applies when (1) [plaintiff] conferred a benefit on [defendant]; (2) [defendant] knew of the benefit and should reasonably have expected to repay [plaintiff]; and (3) [defendant] accepted or retained the benefit without paying for its value." T. Musgrove Constr. Co., 850 S.E.2d at 341. And in Minnesota, "[t]o establish an unjust enrichment claim, the claimant must show that the defendant

has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay." ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc., 544 N.W.2d 302, 306 (Minn. 1996). Quantum meruit and unjust enrichment are therefore substantially the same under Virginia and Minnesota law, and the court will apply Virginia law. See Perini/Tompkins Jt. Venture, 738 F.3d at 101.

### b.   No Enforceable Contract Governs the Dispute's Subject Matter

In Virginia,[2] implied contract actions such as quantum meruit and unjust enrichment are unavailable when an express contract governs the dispute's subject matter. See Mongold v. Woods, 677 S.E.2d 288, 204 (Va. 2009) (noting that "for a court to award a quantum meruit recovery, the court must conclude that there is no enforceable express contract between the parties covering the same subject matter"); CGI Fed. Inc. v. FCi Fed., Inc., 814 S.E.2d 183, 190 (Va. 2018) ("The existence of an express contract covering the same subject matter of the parties' dispute precludes a claim for unjust enrichment."). Here, Taylor asserts that "any claim [Morris] may have for commission or bonuses arises under the Sales Compensation Plan, and there is as a matter of law no basis for Morris to pursue implied contractual theories . . . ." (Id.) Morris instead contends that the 2019 and 2020 Sales Compensation Plans lack the requisite consideration to constitute enforceable contracts. (Pl.'s Memo. Opp. Mot. Dismiss at 8, 11.)

In Jensen v. Int'l Bus. Mach. Corp., the Fourth Circuit concluded that the "Sales Incentive Plan" IBM issued to an employee governing sales commissions IBM would award him did not constitute an enforceable contract. 454 F.3d at 388. IBM expressly informed the employee that

---

[2] Minnesota law also holds implied contract actions unavailable when an express contract governs. See Faricy Law Firm, P.A. v. API, Inc. Asbestos Settlement Trust, 912 N.W.2d 652, 657 (Minn. 2018) ("Quantum meruit is restitution for the value of a benefit conferred in the absence of a contract under a theory of unjust enrichment.") (internal quotation marks omitted) (emphasis added); Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d 826, 838 (Minn. 2012) (noting that unjust enrichment "does not apply when there is an enforceable contract that is applicable").

(1) he could not rely on the commissions described in the Sales Commission Plan "until such payment has been made," (2) IBM reserved the right to "modify or cancel the Sales Incentive Plan at any time before commissions under it are paid," and (3) the employee "was not entitled to any payment" before receiving such payment. Id. The Fourth Circuit concluded that IBM thus made clear that it "did not invite a bargain or manifest a willingness to enter a bargain" and that "there were no conditions that [the employee] could satisfy to create a binding contract before IBM decided to pay him." Id. (quotation marks omitted).

Here, Taylor similarly reserved "the right to modify or eliminate this plan, or any of its components, at [Taylor's] sole discretion" in the 2019 Sales Compensation Plan. (Compl. Ex. 1 at 2.) Taylor also stipulated in the 2019 Sales Compensation Plan that (1) in the event an employee is terminated, the employee "will not earn any more bonuses" and (2) the employee "must be employed by [Taylor] at the time the Bonus is paid in order to earn the Bonus." (Compl. Ex. 1 at 3.) Given the Sales Compensation Plan's close similarity to the "Sales Incentive Plan" in Jensen, the court concludes that the 2019 (and 2020)[3] Sales Compensation Plan does not constitute an enforceable contract sufficient to defeat Morris's implied contract claims.

### c.   Morris Has Stated Claims for Quantum Meruit and Unjust Enrichment

A claim for quantum meruit arises under Virginia law "where service is performed by one, at the instance and request of another, and nothing is said between the parties as to compensation for such service . . . ." T. Musgrove Constr. Co., 840 S.E.2d at 341 (quoting Mongold v. Woods, 677 S.E.2d 288, 292 (Va. 2009) (alterations omitted)). A successful quantum meruit claim yields "an award of damages amounting to the reasonable value of the work performed, less the

---

[3] As noted above, the 2020 Sales Compensation Plan contains the same language reserving Taylor the right to modify and/or cancel previously-planned commission payments as the 2019 Sales Compensation Plan.

compensation actually received for the work." Id.  The Supreme Court of Virginia has enumerated

four scenarios that give rise to a colorable quantum meruit claim:

> (1) the parties contract for work to be done, but the parties did not
> agree on a price, (2) the compensation mentioned is too indefinite,
> (3) there is a misunderstanding as to the price to be paid, or, (4) in
> some instances, the contract is void and of no effect.

Id.  "When the defendant has not requested the plaintiff's services, a plaintiff's claim is for unjust

enrichment." Id.

Morris contends that he performed work "under the understanding, and based on

representations by Taylor Communications, that [he] would be paid a significant commission" as

compensation.  (Compl. ¶ 36.)  Morris further asserts he "was informed that he would be paid a

commission once the master services agreement and statement of work were executed, both of

which were executed for the NelNet, Inc. Service Agreement on or about February 10, 2020." Id.

¶ 37.  Pointing to the Fourth Circuit's recent decision in Fessler v. Int'l. Bus. Mach. Corp., 959

F.3d 146 (4th Cir. 2020), Morris asserts he has adequately pled claims for both unjust enrichment

and quantum meruit.

In Fessler, the Fourth Circuit reversed a district court's dismissal of a plaintiff's claims for

quantum meruit and unjust enrichment arising out of unpaid commissions.  959 F.3d at 149.  The

plaintiff alleged that IBM "unlawfully 'capped' his sale commissions despite representing to him

that his commissions would be uncapped." Id.  To this end, IBM had issued "Incentive Plan

Letters" to the plaintiff which purported to offer the calculations for sales commissions he could

earn in the future. Id.  In each Incentive Plan Letter, IBM reserved the right to "adjust the Plan

terms," to "modify or cancel the Plan," and make other adjustments. Id. at 149–50.  However,

IBM also provided the plaintiff "PowerPoint presentations describing the terms of the

compensation plan and including information that was not in the [Incentive Plan Letters],"

including that the plaintiff's "payment and earning opportunities were uncapped." Id. at 150. After IBM did not pay his expected commission on three occasion, the plaintiff raised, inter alia, claims for unjust enrichment and quantum meruit. Id. at 151.

The Fourth Circuit concluded that the plaintiff stated claims for unjust enrichment and quantum meruit sufficient to survive a motion to dismiss for failure to state a claim. Id. at 151, 158. The Fourth Circuit first noted that the Incentive Plan Letters "do not contractually bind the parties with respect to the amount of commission [the plaintiff] will receive." Id. at 157. The Fourth Circuit then noted that the plaintiff alleged "that IBM refused to pay him any commissions on a deal he was responsible for and he would not have worked on the deal had he known IBM was not going to pay him for his efforts." Id. (internal quotations omitted). Because the plaintiff alleged that IBM had "continuously represented . . . that he would receive a particular percentage of sales revenue on the deals he closed," the Fourth Circuit concluded (1) it was "not unreasonable as a matter of law to expect a similar rate of commission" for the deals at issue and (2) the plaintiff thus stated a claim for unjust enrichment. Id. at 158.

As for the quantum meruit claim, the Fourth Circuit noted that the plaintiff "alleg[ed], at a minimum, there [was] a misunderstanding as to the price to be paid and that the value of his work was a lot more than the compensation he received." Id. at 159. Because the Incentive Plan Letters did not "create a binding agreement governing compensation," the Fourth Circuit concluded that "quantum meruit applies to permit [the plaintiff] to receive a 'reasonable value of the work performed,'" and that the plaintiff adequately stated such a claim. Id. (quoting T. Musgrove Constr. Co., 840 S.E.2d at 341). The Fourth Circuit further noted that because the plaintiff alleged "that he had a hybrid arrangement that consisted of a base salary paired with uncapped

commissions," IBM could not defeat his quantum meruit claim by simply arguing that his "salary alone precludes [the plaintiff's] quantum meruit claim as a matter of law." Id. at 159 n.14.

With Fessler in mind, the court concludes that Morris has stated claims for unjust enrichment and quantum meruit. As in Fessler, the 2019 and 2020 Sales Compensation Plans here do not constitute enforceable contracts binding Taylor. Moreover, Morris similarly argues that he worked on Taylor's behalf "under the understanding, and based on representations by Taylor Communications, that [he] would be paid a significant commission" as compensation, that he "was informed that he would be paid a commission once the master services agreement and statement of work were executed," and that Taylor never paid him a commission for his efforts as expected. (Compl. ¶¶ 36–37.) Therefore, Morris can assert both a claim for unjust enrichment and a quantum meruit claim "to receive a 'reasonable value of the work performed.'" Fessler, 959 F.3d at 159 (quoting T. Musgrove Constr. Co., 840 S.E.2d at 341).

## III.  COUNTS IV & V: FRAUDULENT AND NEGLIGENT MISREPRESENTATION

Taylor next contends that Morris has not sufficiently stated claims for fraudulent and negligent misrepresentation. Specifically, Taylor argues that Morris has not pled his fraudulent and negligent misrepresentation claims with the particularity Rule 9(b) mandates.

Under Federal Rule of Civil Procedure 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); see also McCauley v. Home Loan Inv. Bank, F.S.B., 710 F.3d 551, 559 (4th Cir. 2013). Moreover, "the circumstances required to be pled with particularity under Rule 9(b) are the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." McCauley, 710 F.3d at 559 (quoting Harrison

v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999)) (internal quotation marks omitted).

Morris, on the other hand, again points to Fessler in arguing that his claims should survive the motion to dismiss.  There, the Fourth Circuit concluded that the plaintiff pled his claims for fraudulent misrepresentation and constructive fraud with sufficient particularity to satisfy Rule 9(b).  Fessler, 959 F.3d at 155.  Indeed, the plaintiff alleged in his complaint that "around the time the [Incentive Plan Letters] were presented to him (time), false representations were made in the PowerPoint presentations and at sales meetings (place) that his '[e]arning[ ] opportunities remain uncapped' (content) by IBM and its executives (identity)."  Id. (second and third alteration in original).

Here, in support of his fraudulent and negligent misrepresentation claims, Morris's complaint raises several factual allegations that satisfy Rule 9(b)'s particularity requirement.  First, Morris asserts that Taylor told him that once it published its 2020 Sales Compensation Plan, it would become effective retroactive back to January 1, 2020.  (Compl. ¶ 30.)  Second, Morris contends that Taylor's Vice President of Sales informed him in mid-March 2020 that the 2020 Sales Compensation Plan was nearly finalized and, as then discussed, would award commissions on a specified scale.  (Id. ¶¶ 31–32.)  Third, Morris alleges that he worked on the NelNet Service Agreement for approximately one year prior to its execution "under the understanding, and based on representations by Taylor Communications, that Mr. Morris would be paid a significant commission" for his work.  (Id. ¶¶ 34–36.)  Finally, Morris attests that Taylor informed him that it would pay him a commission once Taylor executed the master services agreement and statement of work with NelNet (Id. ¶ 37.)  In light of Fessler, the court concludes that Morris has pled claims for fraudulent and negligent misrepresentation that satisfy Rule 9(b).

IV.     **COUNT VI: PUNITIVE DAMAGES**

Taylor also seeks to dismiss count VI to Morris's complaint, which seeks punitive damages, on the basis that it contravenes both Virginia and Minnesota law.  As a preliminary matter, the court will apply Virginia law to count VI, as (1) the 2019 and 2020 Sales Compensation Plans are not enforceable contracts, meaning the forum selection clause in each Plan is not binding, and (2) under Virginia's choice-of-law rule, Virginia law applies here.  As noted previously, federal courts sitting in diversity must apply the choice of law rules of the forum state. See Klaxon Co., 313 U.S. 487, 496–97 (1941).  Virginia applies lex loci delicti, or the place of the wrong, to tort actions.  Milton v. IIT Rsch. Inst., 138 F.3d 519, 521 (4th Cir. 1998); Eckstein v. Sonoco Prod. Co., No. 7:20-cv-435, 2020 WL 7212579 at *3 (W.D. Va. Dec. 7, 2020) (Urbanski, C.J.).  Here, Morris has asserted claims for fraudulent and negligent misrepresentation, and the conduct giving rise to those torts occurred in Virginia.  The court will therefore apply Virginia law.

"Virginia law imposes a heavy burden on a plaintiff seeking punitive damages." Whitaker v. Hyundai Motor Co., No. 7:17CV00055, 2017 WL 3197243 at *3 (W.D. Va. July 27, 2017) (Conrad, J.).  Indeed, "Virginia courts disfavor punitive damages, assessing them 'only in cases involving the most egregious conduct.'" Id. at *4 (quoting Simbeck, Inc. v. Dodd Sisk Whitlock Corp., 508 S.E.2d 601, 604 (Va. 1999)).  Specifically, "[a] claim for punitive damages at common law in a personal injury action must be supported by factual allegations sufficient to establish that the defendant's conduct was willful or wanton." Woods v. Mendez, 574 S.E.2d 263, 268 (Va. 2003).

In the instant matter, the court has concluded that Morris's fraudulent and negligent misrepresentation claims must survive the motion to dismiss.  The court therefore will not dismiss Morris's claim for punitive damages at this time. See Fessler, 959 F.3d at 159 ("Because we find

the dismissal of Fessler's fraud claim was unwarranted, we also find the dismissal of his claim for punitive damages unwarranted.").

## V.    FORUM SELECTION CLAUSE

Finally, Taylor asks that the court transfer to the United States District Court for the District of Minnesota any of Morris's claims that survive the motion to dismiss. Having previously found that both the 2019 and 2020 Sales Compensation Plans do not constitute enforceable contracts, the court similarly concludes that the forum selection clauses contained therein are similarly unenforceable. Therefore, the court will deny Taylor's motion to transfer.

### Conclusion

For the reasons stated, the motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**, and the court will dismiss Count I with prejudice. The motion to transfer is **DENIED**.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 13ᵗʰ day of January, 2021.

_____
Senior United States District Judge