IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

JAMES MATTHEW MORRIS,   )
            )
   Plaintiff,     )  Civil Action No. 7:20-cv-00604
            )
v.           )
            )  By: Elizabeth K. Dillon
TAYLOR COMMUNICATIONS SECURE )   United States District Judge
& CUSTOMER SOLUTIONS, INC., )
VENTURE SOLUTIONS, INC., and )
TAYLOR CORPORATION,   )
            )
   Defendants.    )

**MEMORANDUM OPINION**

James Matthew Morris was employed as a sales consultant with Taylor Communications Secure & Customer Solutions, Inc. (Taylor) until he was terminated, along with others, on April 6, 2020, as a result of a Covid-related reduction-in-force.   Morris alleges that Taylor wrongfully refused to pay him a sales commission.  His remaining claims are for quantum meruit, unjust enrichment, and negligent misrepresentation.  He asserts that he was entitled to commissions for his work on the Nelnet deal even though he was no longer employed when Taylor received the first payments from Nelnet and he clearly understood that employment was required to receive commissions under Taylor's incentive compensation plans.

Defendants move for summary judgment, and the court, for the reasons stated below, will grant defendants' motion.[1]

---

[1] Defendant Taylor Corporation maintains that plaintiff was not employed by Taylor Corporation and Taylor Corporation did not take any action that forms the basis for any of Morris' claims.  Plaintiff argues that there is an issue of fact as to whether Taylor Corporation is a proper defendant in this case.  It is not necessary to resolve this issue because even if Taylor Corporation should be considered a defendant that is potentially liable to plaintiff, plaintiff's substantive claims do not survive summary judgment.

## I.  BACKGROUND

### A.  Morris' At-Will Employment with an Agreed Salary

Morris began employment with Taylor in July 2015 when he received, reviewed, and then signed and accepted a written offer for a salaried full-time job with Taylor.  The job offer stated that Morris was being offered an exempt position with annualized compensation of $140,010.  (Job Offer Confirmation, Ex. B to Declaration of Craig A. Brandt (Brandt Decl.), Dkt. No. 41-1.)  The offer also said: "Terms of employment (including benefits) will be as provided in the relevant employee handbook, as amended from time to time, except as specified below."  (*Id.*)

Taylor provided a copy of its Employee Handbook, which Morris signed to acknowledge receipt.  The Handbook includes a section on Compensation.  (Taylor Communications Employee Handbook (Empl. Handbook), Ex. C to Brandt Decl. at 22.)  For "Exempt Salaried Employees," it states:

> If you are an exempt salaried employee, you will receive a salary that will compensate you for all hours you work for the Company. This salary is generally established at the time of hire or when you become an exempt employee.  Employees' salary will be subject to review and modification from time to time such as during salary review times.
>
> We will not deduct from your salary due to variations in the quantity or quality of the work performed during the workweek.

(*Id.*)

Morris' job with Taylor was "Technical Solutions Consultant."  He had two primary job duties.  One was to assist other parts of the sales organization to help them manage the process of selling a secure communications project.  The other was to pursue new customers.  As a salaried

employee, Morris understood he was required to perform the tasks/projects assigned to him by his supervisor.

Morris also understood that his employment was "at-will," which meant that "I work for the company at their will, and they can keep me employed or terminate me at-will." (Deposition of James Matthew Morris (Morris Dep.), Ex. A. to Brandt Decl. at 28.)  Taylor never promised Morris that it would employ him for any particular time period.

Taylor paid Morris the agreed upon salary every two weeks while he was employed and did not deduct from salary payments due to variations in the quantity or quality of the work Morris performed.  During March 2020, the month before his employment was terminated, Taylor paid Morris a salary every two weeks in the gross amount of approximately $5,547 per pay period, which reflected an increase in his salary since his hiring in 2015 to an annualized salary of $144,222.

## B.  Incentive Compensation Plans

While Morris was employed, Taylor followed the practice of issuing an annual, written incentive compensation plan for certain categories of employees who held sales-related roles, including Morris.  Each of the plans applicable to Morris were in writing and specified the plan only applied to customer payments received by Taylor while an eligible employee remained employed.  Taylor provided Morris with copies of the annual incentive compensation plans each year from 2015 through 2019.  Morris read the plans and signed the 2016, 2018, and 2019 Plans.

While the plan terms changed somewhat from year to year, the plans included multiple provisions that remained consistent, including the requirement that the customer had to pay Taylor on the contract invoice before the paid amount would be considered eligible for purposes of employee incentive compensation.  For example, the 2019 Plan defined "Bonus-Eligible

Sales" as "Net Sales of Authorized Products/Services for which the Customer has actually paid the Company within the payment terms detailed on the customer invoice." (Taylor Communications 2019 Sales Compensation Plan (2019 Plan), Ex. H to Brandt. Decl. at 1.)

Each year, the incentive compensation plan provided that an employee was ineligible for any incentive compensation on revenue received by the company after his or her employment ended. For example, the 2019 Plan stated, "[f]ollowing termination of employment whether by the sales employee or the Company, sales employee will not earn any more bonuses." (2019 Plan 3.) The plan also stated that nothing in the plan created an employment contract or modified the "at will relationship between the sales employee and the Company." (2019 Plan 2.)

Each of the annual incentive compensation plans stated the time period during which it was effective. For example, the 2019 Plan said on its first page that it was effective from January 1, 2019, through December 31, 2019. (2019 Plan 1.) Taylor typically disseminated its annual incentive compensation plans for sales employees sometime during the first quarter of a new year. When this happened, the new plan would be retroactive to the first of the year.

On February 13, 2020, Taylor issued a notice to all sales employees, including Morris, reminding them that all previously issued sales compensation plans were "withdrawn" and that the company was in the process of "redesigning all our sales compensation plans to regain sustainable profitability in our organization." (Morris Dep. 76–77.) The same notice stated that when the new 2020 incentive compensation plan was issued, it would be retroactive to January 1, 2020, and that any incentive compensation earned under the 2020 Plan would be paid out according to its terms. In short, the 2020 Plan was the sole basis for determining whether a payment of commissions or bonuses was due on money received by Taylor on customer contracts during 2020. As with the earlier plans, the 2020 Plan expressly stated that the customer

4

was required to actually pay the company on a sale for the sale to be eligible for a commission. (Taylor Communications 2020 Sales Compensation Plan (2020 Plan), Ex. J to Brandt Decl. at 1.) The 2020 Plan also provided that employees were not eligible to receive incentive pay on money received after the end of employment.  The 2020 Plan was issued on April 20, 2020.  (2020 Plan, Dkt. No. 44-1 at 4.)

## C.  Morris' Work on the Nelnet Opportunity

In the spring of 2019, Morris' supervisor, Tom Dailey, asked Morris to assist another Taylor employee, Jeff Teal, who was leading a team of employees working to develop a potential sale of a services contract to a customer called Nelnet.  Morris and other employees, including Dailey and Teal, worked intermittently on activities related to the Nelnet opportunity for approximately one year before the contract between Nelnet and Taylor was signed. Throughout this period, Taylor paid Morris his salary every two weeks, and Morris also worked on other customer accounts and opportunities.  Morris and Teal worked on different aspects of the Nelnet project; they worked well together; and their work was a "joint effort."  (Morris Dep. 143–45.)  Dailey testified that Morris "was instrumental, yes, in helping us through 2019, you know, kind of bring this together to recognize the Win and actually get it—and get it implemented along with the rest of the team members."  (Deposition of Thomas H. Dailey (Dailey Dep.) at 83, Dkt. No. 43-9.)  Morris testified that the "majority" of his "time during that year was spent on Nelnet."  (Morris Dep. 109.)

Nelnet, which is in the student loan business, entered into the services agreement with Taylor on February 10, 2020.  (Master Services Agreement Between Taylor Communications and Nelnet (Nelnet Agreement), Ex. L to Brandt Decl.)  The agreement established terms for Taylor to provide certain print and mailing services as may be requested by Nelnet over a three-

year period, but it did not obligate Nelnet to purchase any amount or quantity of services.  Nelnet did not make any payments to Taylor when the February 2020 services agreement was signed or at any time on or before the workforce reduction became effective on April 6, 2020.  Nelnet's first payment to Taylor on the new 2020 services agreement was not received by Taylor until August 2020.[2]

Morris testified that he "was not just working for a salary."  (Morris Dep. 107.)  He believed that commissions were to compensate him for work on larger opportunities.  The "more complicated the deal was, the more commission you got paid to compensate you for all that work."  (*Id.* at 199–200.)  No doubt commissions motivated Morris as well as other employees.

He understood, based on the representations made to him and what he asserts to be a customary practice at Taylor, that compensation would be paid if the Nelnet contract was executed.  (*Id.* at 54, 55.)  "The trigger date [for commissions] was always the signing of the statement of work."  (*Id.* at 238; *see also id.* at 154.)  Morris testified, "I was told numerous times by my manager that if I was successful in selling the Nelnet deal and got an executed contract, that I would be paid."  (*Id.* at 115.)[3]  Morris, however, makes admissions that clarify his understanding and the customary practice at Taylor.  He stated, "if the customer was invoiced

---

[2]  The Nelnet 2020 services agreement generated significantly less revenue than originally expected due to the impact of the Covid pandemic.  "Government issues" associated with the pandemic limited Nelnet's ability to "bill student loans," which "pretty much eliminated a lot of profit" that Taylor had expected when the contract was signed.  (Deposition of Angela Passanesi (Passanesi Dep.), Ex. O to Brandt Decl. at 25.)

[3]  Morris advances a theory that because opportunities resulted in ongoing services, where many cycles of invoices and payments would occur for years to come, there were occasions when Morris was paid commission when a deal was closed.  (*See* Sales Win Spreadsheet (showing payments approved based on estimated values for first year and total opportunity), Dkt. No. 43-13.)  If the services ultimately rendered did not match the estimate, an adjustment or offset would occur.  (Morris Dep. 89–90; Deposition of Simeon David Palomino (Palomino Dep.), Dkt. No. 43-12 at 12 (stating that "as a matter of practice, though, we would advance compensations, in some cases, depending on the compensation plan, based upon either an arrangement, in terms of the actual order, or it could have been from the actual invoice date itself, but not the actual payment").)  As the court will explain later, these provisions are not applicable to Morris' claims.

and the customer did not pay their bill within the terms that Taylor required, then we would not earn commissions until the customer paid their bill." (*Id.* at 62.)  Morris also confirmed that Dailey explained in discussions about the compensation plan that a commission would be paid only if the employee made a sale *and* satisfied the plan terms.  (*Id.* at 155.)  Morris has acknowledged that Dailey never said anything specific about a commission related to the Nelnet project.  (*Id.* at 120.)  Dailey confirmed that he never made any promise to Morris about the amount of compensation he might receive related to Nelnet.  (Dailey Dep. 95.)  Dailey, whose employment with Taylor ended in March 2020, did not expect to receive any incentive compensation based on the Nelnet contract after his employment, and he did not receive any. (*Id.* at 12, 104.)  Morris also admitted that on all occasions when he was paid incentive compensation, he was actively employed with the company when the customer paid the revenue from which the commission was paid.  (Morris Dep. 117.)

Nelnet's first payment on the 2020 services agreement was received by Taylor in August 2020.  Both Morris and Dailey, who were not employed by Taylor at that time, received no commission payments from the Nelnet contract.  (Dailey Dep. 12.)  Teal, who remained actively employed throughout 2020 and 2021, did receive commissions when Nelnet made multiple payments to Taylor.

**D.  Morris' Separation From Employment on April 6, 2020**

Morris was discharged from employment with Taylor on April 6, 2020, when his position was eliminated due to the COVID pandemic.  As of the date of his discharge, Taylor had received no payments from Nelnet associated with the services agreement signed on February 10, 2020, and no one else, employed or not by Taylor on that date, had received any Nelnet

commissions.[4]

## II.  ANALYSIS

### A.  Summary Judgment

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party.  *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c), 56(e).  All inferences must be viewed in a light most favorable to the non-moving party, but the nonmovant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

---

[4] After Morris' separation, Taylor changed its name to Venture Solutions.  Morris named Taylor Corporation as a defendant because of his belief that his former employer Taylor Communications was owned by Taylor Corporation.

**B.  Count Two (quantum meruit) and Count Three (unjust enrichment)**

The remedy of quantum meruit in Virginia[5] has been described as follows: "[w]here service is performed by one, at the instance and request of another, and . . . nothing is said between the parties as to compensation for such service, the law implies a contract, that the party who performs the service shall be paid a reasonable compensation therefor."  *Musgrove Constr. Co., Inc. v. Young*, 840 S.E.2d 337, 341 (Va. 2020).  Quantum meruit is available when (1) the parties contract for work to be done, but the parties did not agree on a price, (2) the compensation mentioned is too indefinite, (3) there is a misunderstanding as to the price to be paid, or (4) in some instances, the contract is void and of no effect.  *Id.* (citing *Marine Dev. Corp. v. Rodak*, 300 S.E.2d 763, 765 (Va. 1983)).  The measure of recovery for quantum meruit for a contract implied is the reasonable value of the services provided.  *Id.* at 341 (citing *Mongold v. Woods*, 677 S.E.2d 288 (Va. 2009)).

The cause of action for unjust enrichment applies when (1) plaintiff conferred a benefit on defendant, (2) defendant knew of the benefit and should reasonably have expected to repay plaintiff, and (3) defendant accepted or retained the benefit without paying for its value.  *Id.*  The measure of recovery for unjust enrichment is limited to the benefit realized and retained by the defendant.  *Id.* (citing *Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834 (Va. 2008))*.*

In distinguishing between these types of claims, the Supreme Court of Virginia stated that when the defendant "has *not* requested the plaintiff's services, a plaintiff's claim is for unjust enrichment."  *Id.* (emphasis added).  Thus, defendants argue that Morris' claim is for quantum

---

[5] Judge Conrad's opinion addressing defendants' motion to dismiss analyzed a choice of law issue between Virginia and Minnesota.  At this stage, both parties agree that Virginia law applies.  Judge Conrad found that the difference would not be outcome-determinative.  (Dkt. No. 16 at 11.)

meruit, not unjust enrichment.  Morris was employed by Taylor, and, as such, he performed

services at the direction and request of Taylor.  Thus, quantum meruit is the correct avenue of

recovery for Morris, but it is not necessary to resolve this issue because Morris' claim fails under

either theory of recovery, which Morris has pled in the alternative.  *See Kessler v. Int'l Bus.*

*Machines Corp.*, 959 F.3d 146, 157 n.11 (4th Cir. 2020) (noting that the claims can be pled in the

alternative).

      "A contract implied in law, or a quasi-contract, is not a contract, but an action in

restitution in which the defendant received a gain at plaintiff's expense under circumstances that

make it unjust for the defendant to keep the gain."  *Id.* at 341 n.3.  A claim based on an alleged

implied contract will be dismissed if it is "not objectively reasonable."  *Nedrich v. Jones*, 429

S.E.2d 201, 207 (Va. 1993).  "One may not recover under a theory of implied contract simply by

showing a benefit to the defendant, without adducing other facts to raise an implication that the

defendant promised to pay the plaintiff for such benefit."  *Id.*

      Morris seeks to recover a commission based on the February 2020 services contract

between Taylor and Nelnet.  Taylor argues that Morris' claims are barred because there is an

express contract between the parties governing compensation.  "The existence of an express

contract covering the same subject matter of the parties' dispute precludes a claim for unjust

enrichment."  *CGI Fed. Inc. v. FCi Fed., Inc.*, 814 S.E.2d 183, 190 (Va. 2018).  The July 2015

letter from Taylor to Morris governing compensation establishes that Morris' salary represented

his entire compensation for all work performed.  Morris points to the incentive compensation

plan, but, as the court explained in its order addressing defendants' motion to dismiss, the 2019

and 2020 incentive compensation plans did not constitute enforceable contracts.  (Dkt. No. 16 at

12.)  In a similar circumstance, a court held that an employer is not "unjustly enriched" by an

employee "performing the job he was paid a salary to perform."  *McCabe v. Abbott Labs., Inc.*,
47 F. Supp. 3d 339, 349 (E.D.N.C. 2014) (granting motion for summary judgment and
dismissing employee's claim for unjust enrichment based on the parties' express contract, under
which the employee agreed to work for a base salary and the possibility, at the employer's
discretion, of additional incentive compensation).

Morris argues that his claims are not barred because of the absence of an express contract
governing the same subject matter.  Judge Conrad held, for example, that Morris' implied claims
are not barred by the Sales Compensation Plans because the latter are not enforceable contracts.
(Dkt. No. 16 at 8–12.)  Further, it is not disputed between the parties that Morris' employment
was at-will.  However, per the job offer letter signed and returned in July 2015, there *was* an
express agreement between the parties about the amount of compensation Morris would receive
for services he provided and that the terms of employment would be as set forth in the applicable
employee handbook.  Because this express agreement governs the same subject matter as the
claims for unjust enrichment and quantum meruit—unpaid commissions as an alleged aspect of
salary—the claims are barred.

Even if Morris' claims are not barred by an express agreement, there are no facts showing
a reasonable expectation or notification that Taylor promised to pay commission on revenue to
an employee that was received after that employment was terminated.  Morris was informed
repeatedly that no incentive compensation would be paid in the absence of payments received
from customers at a time when Morris was employed.  *See Nedrich*, 429 S.E.2d at 208 (claim for
bonus not objectively reasonable where right to receive bonus was defined by plain language);
*see also Dulaney v. Inmar, Inc.*, 725 S.E.2d 473, 2012 WL 1514746, at *4 (N.C. Ct. App. May 1,
2012) (rejecting unjust enrichment claim when plan language clearly stated that employee had no

right to recover commissions that did not come due until after her employment ended); *Morris v. Int'l Bus. Mach. Corp.*, Case No. 1:18-CV-0042-LY, 2018 WL 7291382, at *4 (W.D. Tex. 2018).

Morris argues that there was an expectation, understanding, or practice that sales commission would be paid when the sales contracts are executed, not when payments are eventually made pursuant to those contracts. As outlined above, Morris' testimony on this point is dodgy. He testified explicitly that "if the customer was invoiced and the customer did not pay their bill within the terms that Taylor required, then we would not earn commissions until the customer paid their bill." (Morris Dep. 62.) He later asserted that he was informed annually that he "would be paid commission for service agreements that he successfully executed." (*Id.* at 154.) However, Morris confirmed that Dailey explained in discussions about the compensation plan that a commission would be paid only if the employee made a sale *and* satisfied the plan terms. (*Id.* at 155.) Morris also testified that he was "told numerous times by my manager [Dailey] that if I was successful in selling the Nelnet deal and got an executed contract that I would be paid." (*Id.* at 115.) Morris then backtracked and acknowledged that Dailey never said anything specific about a commission related to the Nelnet project. (*Id.* at 120.) Dailey testified that he never made any promise to Morris about the amount of compensation he might receive related to Nelnet. (Dailey Dep. 95.) Dailey did not expect to receive any incentive compensation based on the Nelnet contract after his employment with Taylor ended in March 2020. (*Id.* at 104.) Morris also admitted that on all occasions when he was paid incentive compensation, he was actively employed with the company when the customer paid the revenue on which the commission was paid. (Morris Dep. 117.)

In addition to all of this, it bears repeating that the plan terms required that the employee be actively employed when the payment is received from the customer.  In short, Morris' conflicting testimony is not enough to create a genuine fact issue on whether he was reasonably entitled to unpaid commissions, and neither does any of the other evidence elicited in this case, considering the clear plan language to the contrary and Morris' admissions.  *See Rohrbough v. Wyeth Labs.*, 916 F.2d 970, 975 (4th Cir. 1990) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.") (internal citation omitted).  If Morris' claim is for quantum meruit, there was no misunderstanding or lack of agreement on the price to be paid for his services, and the receipt of commission payments for the Nelnet contract would be unreasonable given the undisputed facts in this case.  *See Musgrove*, 840 S.E. 2d at 341.  In the alternative, if Morris' claim is for unjust enrichment, he had no reasonable expectation of receiving commission payments based on revenue received by Taylor after his employment was terminated.  *Id.*

The court recognizes Morris' evidence about "advance" commission payments, which are mentioned in the incentive compensation plans with provisions for pay back by the employee of any advances when payment is not received.  (*See* Sales Win Spreadsheet (showing payments approved based on estimated values for first year and total opportunity).)  This case, however, is not about advance commission payments or the failure to pay advance commission payments.  Rather, this case involves commissions based on payments received after termination of employment.  Morris provides no evidence of a payment being made to an employee after leaving employment, and there is no evidence to support the reasonableness of an expectation of post-employment payments.  Importantly, Morris' claim is not that he should have received

advance payments under the plan provisions while he was employed, and there is no evidence or argument in the record about Morris meeting those separate requirements.  (*See* 2019 Plan, 2020 Plan (provisions related to Draw, Estimated Commissions, and Reconciliation).)

Finally, Morris places heavy emphasis on the Fourth Circuit's decision in *Fessler*, which vacated and remanded a district court's Rule 12(b)(6) dismissal of quantum meruit and unjust enrichment claims based on unpaid commissions.  959 F.3d at 149.  *Fessler*, however, is distinguishable because it involved inconsistent evidence about whether commission payments were limited to a certain amount ("capped" or "uncapped").  *Id.* at 150.  The employer in *Fessler* presented "PowerPoint presentations describing the terms of the compensation plan" which "noted, no less than six times, that Fessler's payments and earning opportunities were uncapped."  *Id.*  "Fessler sufficiently alleges that given the misrepresentations by IBM and its executives, and his past dealings with the company, they both reasonably expected that IBM would pay Fessler a higher commission payment than he received."  *Id.* at 157.  Here, there is unequivocal evidence (via the plan document language and other testimony) that the company would not pay commission on contract payments received after the employment ended.  Each of the company's incentive plans consistently informed Morris that no incentive compensation would be earned until customer payments were received by Taylor, and if those payments came after his employment ended, he would get no commission.[6]

For these reasons, defendants are entitled to summary judgment on Morris' implied contract claims.

---

[6] *Fessler* is also distinguishable because it addressed a Rule 12(b)(6) motion, not a summary judgment motion.  959 F.3d at 152 (distinguishing a case because it "occurred at the summary judgment phase, where the plaintiff's clam was assessed on the sufficiency of the factual support he provided.  Here, IBM faces a higher burden to show that Fessler failed to state a claim upon which relief can be granted").

**C.  Count Five (negligent misrepresentation)[7]**

To establish a claim of negligent misrepresentation, Morris must establish a false representation of material fact, that is made negligently, and reasonable reliance on that false statement to Morris' detriment.  *Klaiber v. Freemason Assocs., Inc.*, 587 S.E.2d 555, 558 (Va. 2003).

Morris has generally alleged that he was told that he would be paid commissions for service agreements that he successfully executed with potential clients.  Morris' deposition testimony demonstrates his understanding that he would be paid a bonus or commission only if the employee was involved in a sale and satisfied the applicable compensation plan terms. (Morris Dep. 154–55.)  The plan language is clear and unequivocal.  Therefore, there was no reasonable reliance on an allegedly false representation, nor was there a false representation in the first instance.  This is unlike the situation in *Fessler* because there were no inconsistent representations made to Morris.

Also, the alleged representation about commissions is not a statement about a past or present material fact.  Instead, it is only a statement about a future event or a prediction. *Supervalu, Inc. v. Johnson*, 666 S.E.2d 335, 342 (Va. 2008) ("Because fraud must involve a misrepresentation of a present or a pre-existing fact, fraud ordinarily cannot be predicated on unfulfilled promises or statements regarding future events.").  Moreover, promissory statements can be actionable only if the promisor had no intention of performing the promise at the time of making the statement.  *Id.*

The court will grant defendants' motion for summary judgment on this claim.

---

[7]  In response to defendants' motion to dismiss, Morris abandoned his claims for fraudulent misrepresentation and for punitive damages.  Thus, the only remaining claim to analyze is the negligent misrepresentation claim.

III.  CONCLUSION

Based on the foregoing, the court finds that defendants are entitled to summary judgment and will issue an appropriate order.

Entered: March 14, 2022.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge